109 T.C. No. 8


UNITED STATES TAX COURT


ALUMAX INC. AND CONSOLIDATED SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7779-95.                    Filed September 30, 1997.


        For certain years prior to the period at issue,
petitioners, company A (A) and its subsidiaries (A
group), were members of an affiliated group of corpora-
tions within the meaning of sec. 1504(a)[1] that had A as
its common parent, which filed consolidated returns for
those corporations.  During that time, A had issued and
outstanding two classes of stock, each of which pos-
sessed 50 percent of the voting power of all classes of
its stock, one class of which was held by certain
corporations (B group stockholders) who were members of
an affiliated group of corporations (B group) within
the meaning of sec. 1504(a), and the other class of
which was held by certain other corporations (C group
stockholders).  Company B (B) filed consolidated re-

_____

[1]  Unless otherwise indicated, all section references are to the
Internal Revenue Code (Code) in effect for the years at issue.
All Rule references are to the Tax Court Rules of Practice and
Procedure.

turns for years preceding the period at issue as the common parent of the B group.

Around the beginning of the period at issue, A amended its certificate of incorporation (certificate) and thereby effected certain changes in its capital structure and in the rights of its capital stock. Around the same time, A and its stockholders executed a stockholders agreement (agreement) that also effected certain changes in the rights of A's capital stock. Thereafter, A had two classes of stock outstanding that had the rights stated in the certificate and the agreement and that were held by the B group stockholders and the C group stockholders, respectively.

For each year during the period at issue, B filed a consolidated return in which it claimed to be the common parent of an affiliated group within the meaning of sec. 1504(a) that consisted of corporations in both the A group and the B group. During the course of the examination by the Internal Revenue Service of those consolidated returns, either B or its successor executed written agreements extending the period of limitations under sec. 6501 for each year during the period at issue for the assessment of tax due from the corporations that were included in those returns.

Held: For each year during the period at issue, petitioners were not members of the affiliated group within the meaning of sec. 1504(a) that had B as its common parent, and, consequently, they are not entitled to join in the consolidated return that B filed for each of those years in which it claimed to be the common parent of a group of corporations that included petitioners. Held, further, the period of limitations under sec. 6501 for each of the years during the period at issue for the assessment of tax due from the A group has not expired.

Willard B. Taylor, Michael Lacovara, Philip L. Graham, Jr., and Michael W. Martin, for petitioners.

Lewis R. Mandel and Robert E. Marum, for respondent.

OPINION[2]

CHIECHI, Judge: Respondent determined the following defi-
ciencies in petitioners' Federal income tax:

| Taxable Year Ended | Deficiency |
|---|---|
| Dec. 31, 1981 | $5,663,086 |
| Dec. 31, 1983 | 11,454,565 |
| Dec. 31, 1984 | 40,433,142 |
| Dec. 31, 1985 | 48,511,681 |
| Nov. 24, 1986[1] | 23,175,558 |

[1]  We shall refer to the taxable year ended Nov. 24, 1986, as
1986.

The principal issues for decision are:[3]

(1) Were petitioners members of the affiliated group within
the meaning of section 1504(a) that had Amax Inc. (Amax) as its
common parent, which filed a consolidated Federal income tax
return (consolidated return) for each of the years 1984, 1985,
and 1986 that included petitioners?[4]  We hold that they were not

_____

[2]  Unless otherwise indicated, our Opinion pertains to the years
1984, 1985, and 1986 (period at issue).

[3]  Correlative issues also remain as to whether petitioners are
entitled for 1981 and 1983 to general business credits that they
carried back (1) from 1984 to 1981 and (2) from 1985 and 1986 to
1983.  Respondent claims, and petitioners do not dispute, that
resolution of those correlative issues is governed by the Court's
holdings on the principal issues presented.

[4]  We shall sometimes refer (1) to the corporations that are
petitioners in this case and that were included in the consoli-
dated returns filed by Amax as the common parent of an affiliated
group for the years 1984, 1985, and 1986 as petitioners' group
and (2) to Amax and its subsidiaries, excluding petitioners'
group, that were included in those consolidated returns as the
Amax group.

and that therefore petitioners may not join in any of those consolidated returns.

(2) Has the period of limitations under section 6501 for each of the years 1984, 1985, and 1986 for the assessment of tax due from petitioners' group expired?  We hold that it has not.

This case was submitted fully stipulated.  All of the facts that have been stipulated are so found unless otherwise stated herein.

General

Alumax Inc. (Alumax), a Delaware corporation organized by Amax on October 17, 1973, had its principal place of business in Norcross, Georgia, at the time the petition was filed.[5]  At all relevant times Alumax has been an integrated aluminum company engaged in the production and sale of primary aluminum, semi-fabricated products, and diverse fabricated products.

Amax, a New York corporation organized in 1887, has been at all relevant times a worldwide supplier of metals and energy, as well as a manufacturer and distributor of metals-related products and chemicals.[6]  Prior to December 5, 1973, Amax' principal businesses were in aluminum, coal, gold, and molybdenum.  Amax conducted the aluminum business, which it had entered during

---

[5]  Since its incorporation, Alumax has operated under different names.

[6]  Since its incorporation, Amax has operated under different names.

1962, through certain domestic and foreign subsidiaries (Amax Aluminum Group).

On December 5, 1973, Amax caused Amax Realty Corp. (Amax Realty), Bemax Realty Corp. (Bemax), and Cemax Corporation (Cemax), three of its wholly owned subsidiaries that were part of the Amax Aluminum Group, to transfer to Alumax substantially all of their respective assets. In consideration for those transfers, Alumax assumed substantially all of the respective liabilities of those corporations and issued to them 70, 58, and 52 shares, respectively, of its common stock. On the same date, Amax transferred to Alumax the capital stock of substantially all of its other subsidiaries that were part of the Amax Aluminum Group. In consideration for those transfers, Alumax issued to Amax 320 shares of its common stock. After the transfers on December 5, 1973, Alumax had 500 shares of common stock issued and outstanding.

The 1974 Restructuring of Alumax

The 1974 Restated Certificate of Incorporation
and the 1974 Stockholders Agreement

On January 15, 1974, Alumax filed with the Office of the Secretary of State of Delaware (Delaware Secretary of State) a restated certificate of incorporation (1974 restated certificate of incorporation) that was effective as of that date (1974 restructuring). On a date not specified in the record, Alumax and certain of its stockholders executed a stockholders agreement

dated as of January 16, 1974 (1974 stockholders agreement) that contained certain of the provisions that were contained in the 1974 restated certificate of incorporation. Unless otherwise indicated, the 1974 restated certificate of incorporation effected, inter alia, the following.

Alumax was authorized to issue (1) 500 shares of class A common stock (class A common stock) that had a par value of $100 a share and (2) 500 shares of class B common stock (class B common stock) that had a par value of $100 a share. As a result of the 1974 restructuring, (1) the 320 shares of the Alumax common stock that Amax held as of January 15, 1974, were changed into 70 shares of the class A common stock and 250 shares of the class B common stock, and (2) the 70, 58, and 52 shares of the Alumax common stock that Amax Realty, Bemax, and Cemax, respectively, held as of that date were changed into 70, 58, and 52 shares of the class A common stock.

On January 30, 1974, pursuant to an agreement between Amax and Mitsui & Co. Ltd. (Mitsui Japan), a Japanese general trading company engaged at all relevant times, inter alia, in the trading of base and refined metals including aluminum and the manufacturing of consumer and industrial products in Japan, Amax sold to Mitsui Japan all 250 shares of the class B common stock that it held for $125 million in cash.

Each share of each class of Alumax common stock had one vote, and any action of the Alumax stockholders required an

affirmative vote of a majority of the outstanding shares of each such class. The affirmative action of a majority of the outstanding shares of each class of Alumax common stock was required (1) to amend, modify, or repeal the 1974 restated certificate of incorporation and (2) to amend or repeal the Alumax bylaws.

The 1974 stockholders agreement provided that Alumax was to pay dividends on or with respect to its stock at such times and in such amounts as its board of directors (Alumax board) determined was appropriate in light of its earnings, cash flow, and capital requirements. Each share of each class of Alumax common stock participated equally in all dividends and other distributions on or with respect to such stock, including distributions in liquidation or dissolution and dividends or other distributions as may have been duly declared by the Alumax board.

The Alumax board, which consisted of 10 voting and 2 nonvoting members, exercised all corporate powers (Alumax board corporate powers) unless otherwise expressly provided by law, the 1974 restated certificate of incorporation, and/or the Alumax bylaws. Except as not pertinent here, the class A common stock and the class B common stock had the following voting rights with respect to the Alumax board membership: (1) The class A common stock had the right by affirmative vote of a majority of the outstanding shares of that stock entitled to vote to elect, remove with or without cause, accept resignations of, and fill vacancies in the offices of one-half of the voting members of the Alumax board;

(2) the class B common stock had the right by affirmative vote of a majority of the outstanding shares of that stock to elect, remove with or without cause, accept resignations of, and fill vacancies in the offices of the remaining half of those voting members; and (3) both classes of Alumax common stock had the right by affirmative vote of a majority of the outstanding shares of each such class of stock to elect, remove with or without cause, accept resignations of, and fill vacancies in the offices of any of the nonvoting members of the board and to increase or decrease the number of those Alumax board members.

In exercising the Alumax board corporate powers,

(1) each voting member of the Alumax board had one vote;

(2) a majority of the five voting members of the Alumax board who were elected by the class A common stock and a majority of the five voting members of that board who were elected by the class B common stock were necessary to constitute a quorum for transacting business at any meeting of that board; and

(3) any action by the Alumax board required an affirmative vote of a majority of each of the five voting members of that board who were elected by the class A common stock and a majority of the five voting members of that board who were elected by the class B common stock, who were present and voting.

Amendments to the 1974 Restated
Certificate of Incorporation and
the 1974 Stockholders Agreement

On April 29, 1974, the 1974 restated certificate of incor-

poration was amended in order, inter alia, to restate (1) Article Fourth (d) to provide that the Alumax board had 12, instead of 10, voting members and 3, instead of 2, nonvoting members and (2) Article Fifth to provide that at any meeting of the Alumax board 3 of the 6 voting members of that board who were elected by the class A common stock and 3 of the 6 voting members of that board who were elected by the class B common stock were necessary to constitute a quorum for transacting business.

On June 26, 1974, the 1974 stockholders agreement was amended to incorporate the amendments made to the 1974 restated certificate of incorporation on April 29, 1974.

Transfers of Certain Alumax Stock During 1975

During 1975, Amax transferred the 70 shares of the class A common stock that it held to its wholly owned subsidiary, Amax Securities, Inc. (Amax Securities), a Delaware corporation and a member of the Amax group. Thereafter, small numbers of the shares of the class A common stock were from time to time transferred to certain unidentified subsidiaries of Amax that were members of the Amax group.

On March 31, 1975, Mitsui Japan sold 25 of the 250 shares of the class B common stock that it held to Nippon Steel Corporation (Nippon Steel), a Japanese corporation engaged at all relevant times in a wide range of manufacturing, product development and service activities in the metals, chemicals, ceramics, electronics, information, communications, environmental preservation,

engineering, and construction fields.  On February 27, 1980, Mitsui Japan sold 175 of the 225 shares of the class B common stock that it held to its wholly owned subsidiary Mitsui & Co. (U.S.A.), Inc. (Mitsui USA), a New York corporation that conducted Mitsui Japan's principal trading activities in the United States.  (We shall sometimes refer collectively to Mitsui Japan and Mitsui USA as the Mitsui group or as the Mitsui group stockholders.)

The 1984 Restructuring of Alumax

On March 9, 1984, Alumax filed with the Delaware Secretary of State a restated certificate of incorporation (1984 restated certificate of incorporation) that was effective as of January 1, 1984 (1984 restructuring).  Also on March 9, 1984, Alumax and its stockholders executed a stockholders agreement that also was effective as of January 1, 1984 (1984 stockholders agreement) and that contained certain of the provisions that were contained in the 1984 restated certificate of incorporation.  Unless otherwise indicated, the 1984 restated certificate of incorporation effected, inter alia, the following.

Alumax was authorized to issue (1) 250 shares of class A common stock (Alumax class A common stock) that had a par value of $100 a share, (2) 250 shares of class B common stock (Alumax class B common stock) that had a par value of $100 a share, and (3) 250 shares of class C common stock (Alumax class C common stock) that had a par value of $100 a share.  However, no share

of the Alumax class A common stock could be issued and outstanding at any time that any share of the Alumax class C common stock was issued and outstanding, and no share of the Alumax class C common stock could be issued and outstanding at any time that any share of the Alumax class A common stock was issued and outstanding.  As a result of the 1984 restructuring, (1) the 250 shares of the class A common stock that Amax Realty, Bemax, Cemax, and Amax Securities held were exchanged for 250 shares of the Alumax class C common stock; (2) all shares of the class A common stock were retired and became authorized and unissued shares of the Alumax class A common stock; and (3) the 250 shares of the class B common stock that Mitsui Japan, Mitsui USA, and Nippon Steel held became 250 shares of the Alumax class B common stock.  (We shall sometimes refer (1) to the holders of the Alumax class C common stock as the class C stockholders or the Amax group stockholders and (2) to the holders of the Alumax class B common stock as the class B stockholders or the Mitsui/Nippon group stockholders.)  On or about March 31, 1984, Mitsui Japan sold to Mitsui USA the 50 shares of the Alumax class B common stock that it held.  Accordingly, all 250 shares of the Alumax class B common stock were thereafter held by Mitsui USA and Nippon Steel.

Throughout any period during which any Alumax class C common stock was outstanding, (1) each share of the Alumax class B common stock had one vote, and each share of the Alumax class C common stock had four votes on each matter submitted to the

Alumax stockholders; and (2) at each meeting of the Alumax stockholders, or a class of those stockholders, the holders of a majority of the outstanding shares of the Alumax common stock entitled to vote, present in person or by proxy, constituted a quorum. Throughout that period, at each meeting of the Alumax stockholders, the Alumax stockholders were entitled to vote in the aggregate (stockholder aggregate voting requirement), and not by class, on all matters submitted to them (stockholder nonrestricted matters) except certain stockholder restricted matters discussed below, and the affirmative vote of a majority of votes cast on the stockholder nonrestricted matters was required to effect any stockholder action. However, (1) any stockholder action on any stockholder nonrestricted matter was not to take effect for 14 calendar days if it was taken over the express objection of the Mitsui group--the holder of a majority of the outstanding shares of the Alumax class B common stock, and (2) any such stockholder action was not to take effect at all if, as a result of the Mitsui group stockholders' objection and certain other events discussed below, shares of the Alumax class C common stock were purchased by the Mitsui group or converted at the election of the Amax group stockholders into shares of the Alumax class A common stock.

An affirmative vote of a majority of the outstanding shares of each class of Alumax common stock, voting by class and not in the aggregate (stockholder class voting requirement), was re-

quired (1) to amend, modify, or repeal the 1984 restated certificate of incorporation; (2) to make, amend, or repeal the bylaws (1984 bylaws); and (3) to effect any stockholder action on the following matters (stockholder restricted matters) throughout the period during which any Alumax class C common stock was outstanding:

(a) A merger of Alumax;

(b) an acquisition or a disposition of any material asset (i.e., an asset which had, or would have upon acquisition, an aggregate net book value on Alumax' books equal to at least 5 percent of its net worth as shown in its consolidated balance sheet, prepared in accordance with generally accepted accounting principles subject to modification to reflect Alumax and its subsidiaries as a consolidated group separate from the Amax group) (material asset);

(c) a partial or complete liquidation or dissolution of Alumax;

(d) a capital appropriation or an asset disposition request of $30 million or more;

(e) the election or any other selection or dismissal of any chief executive officer of Alumax (CEO);

(f) any transaction involving Alumax and any affiliate of Alumax (i.e., any stockholder of Alumax, any holder of a 20 percent or greater equity interest in such a stockholder, or any entity in which any of the foregoing persons held a 20 percent or

greater equity interest) in which Alumax made a loan to the affiliate or that was not in the ordinary course of business.

During 1984, 1985, and 1986, Alumax' net worth as shown in its consolidated balance sheets was $738 million, $736 million, and $783 million, respectively. Accordingly, an asset constituted a material asset and its acquisition or disposition constituted a restricted matter that was subject to the stockholder class voting requirement if it had a book value of at least $36 million; i.e., 5 percent of Alumax' net worth.

During the period at issue, Alumax had total assets of $1.7 billion. Accordingly, a capital appropriation or an asset disposition request of approximately 1.8 percent of Alumax' total assets; i.e., $30 million, constituted a restricted matter that was subject to the stockholder class voting requirement.

Throughout any period during which any Alumax class C common stock was outstanding, the Alumax board was required to declare and pay dividends to the extent of 35 percent of Alumax' net income to the extent permitted by law (mandatory dividend provision).

The 1984 restated certificate of incorporation contained two facially inconsistent provisions relating to the manner in which dividends were to be allocated between the Alumax class B common stock and the Alumax class C common stock. Paragraph (b)(i)(A) of Article Fifth stated: "Dividends on Class C Common Stock shall be declared and paid at a rate per share equal to one-

quarter (1/4) the rate per share then declared on Class B Common Stock".  Paragraph (b)(i)(C) of Article Fifth stated:

> Except as otherwise provided in this subparagraph (i),
> each share of Common Stock outstanding shall partici-
> pate equally, share and share alike, in all dividends
> and other distributions on or with respect to the
> corporation's Common Stock, including distributions in
> liquidation or dissolution.

All the dividends that were declared and paid by the Alumax board pursuant to the mandatory dividend provision during the period April 20, 1984, through April 25, 1986, were allocated 80 percent to the class B stockholders and 20 percent to the class C stockholders.  On October 26, 1984, the one occasion during the period April 20, 1984, through July 10, 1986, on which the Alumax board declared dividends in excess of the amount required by the mandatory dividend provision (excess dividends), it allocated those excess dividends 50 percent to the class B stockholders and 50 percent to the class C stockholders.

On July 10, 1986, the Alumax board adopted a resolution amending the 1984 restated certificate of incorporation that was approved by the Alumax stockholders and that restated Paragraph (b)(i)(A) of Article Fifth of that certificate to state:  "Divi-dends on Class C Common Stock pursuant to * * * [the mandatory dividend provision] shall be declared and paid at a rate per share equal to one-quarter (1/4) the rate per share then declared on Class B Common Stock."

Dividends that were declared and paid by the Alumax board

pursuant to the mandatory dividend provision on July 25, 1986, and on October 24, 1986, were allocated 80 percent to the class B stockholders and 20 percent to the class C stockholders.  On July 11, 1986, and on September 26, 1986, the two occasions after July 10, 1986, on which the Alumax board declared excess dividends, it allocated such dividends 50 percent to the class B stockholders and 50 percent to the class C stockholders.

On November 17, 1986, the Alumax board adopted a resolution amending the 1984 restated certificate of incorporation that was approved by the Alumax stockholders and that added the following paragraph (b)(i)(D) to Article Fifth of that certificate:

> Anything contained in this Article FIFTH to the con-
> trary notwithstanding, a dividend of $4,532 per share
> for each share outstanding of Class B Common Stock and
> a dividend of $1,133 per share for each share outstand-
> ing of Class C Common Stock shall be declared payable
> on or before * * * [a specified date] * * * to stock-
> holders of record at the close of business on the
> business day immediately preceding * * * [a specified
> date] in respect of the portion of the corporation's
> fiscal quarter ending on December 31, 1986 that shall
> have elapsed up to and including * * * [that] date.

On November 20, 1986, the Alumax board declared dividends pursuant to paragraph (b)(i)(D) of Article Fifth of the 1984 restated certificate of incorporation.

The Alumax board, which consisted of six voting members and two nonvoting members (special class directors) throughout any period during which any share of the Alumax class C common stock was outstanding, exercised all corporate powers unless otherwise expressly provided by law, the 1984 restated certificate of

incorporation, and/or the Alumax 1984 bylaws.  The Alumax class B common stock and the Alumax class C common stock had the following voting rights with respect to the Alumax board membership: (1) The Alumax class B common stock had the right by affirmative vote of a majority of the outstanding shares of that stock to elect, remove with or without cause, accept resignations of, and to fill vacancies in the offices of two of those voting members (class B directors); and (2) the Alumax class C common stock had the right by affirmative vote of a majority of the outstanding shares of that stock to elect, remove with or without cause, accept resignations of, and fill vacancies in the offices of the remaining four of those voting members (class C directors).

The class B directors and the class C directors, voting in the aggregate and not by class, had the right to elect one of the two special class directors (elected special class director). That director was required to be any full-time employee of Alumax other than the CEO of Alumax, who was required to be the other special class director (CEO special class director).  Pursuant to a side letter agreement dated and effective as of March 9, 1984, among Mitsui Japan, Mitsui USA, and Amax, the class B directors were to nominate a person to serve as the elected special class director, and the class C directors were required to vote for that person in the election of the elected special class director and were not allowed to remove that person from that office unless a majority of the class B directors voted in favor of such

removal.

The class B stockholders were entitled to appoint no more than two observers at each Alumax board meeting. Notices of meetings of the Alumax board were sent to those observers who were permitted to attend and participate in all discussions, but not vote, at those meetings.

Throughout any period during which any Alumax class C common stock was outstanding, (1) each of the two class B directors had one vote and each of the four class C directors had two votes on each matter submitted to the Alumax board for a vote, and (2) a majority of the total number of directors constituted a quorum. Throughout that period, at each meeting of the Alumax board, the Alumax directors were entitled to vote in the aggregate (director aggregate voting requirement), and not by class, on all matters submitted to them (director nonrestricted matters) except certain director restricted matters discussed below, and the affirmative vote of a majority of votes cast on the director nonrestricted matters by the directors present and voting at a meeting at which a quorum was present and voting was required to effect any board action. However, (1) any board action on any director nonrestricted matter was not to take effect for 14 calendar days if it was taken over the express objection of any class B director, and (2) any such board action was not to take effect at all if, as a result of that class B director's objection and certain other events discussed below, shares of the Alumax class C common

stock were purchased by the Mitsui group or converted at the election of the Amax group stockholders into shares of the Alumax class A common stock.

An affirmative vote of a majority of the class B directors and class C directors, voting by class and not in the aggregate (director class voting requirement), was required to effect board action on six director restricted matters (director restricted matters) that were identical to the six stockholder restricted matters.

During 1984, 1985, and 1986, the Alumax board voted on various matters at regular quarterly meetings that were held in January, April, July, and October of each such year. In addition to the matters on which the Alumax board voted at those meetings, the Alumax board voted (1) on various matters at a special meeting that was held in September 1986, (2) on various matters by unanimous consent in lieu of a board meeting on four separate occasions, and (3) by unanimous consent either in lieu of a board meeting or at a special board meeting on 10 separate occasions. During the period at issue, the Alumax board voted on a total of approximately 134 matters.

The Alumax board held a regular quarterly meeting on January 27, 1984, prior to the date (i.e., March 9, 1984) on which Alumax filed the 1984 restated certificate of incorporation with the Delaware Secretary of State but after the date (i.e., January 1, 1984) on which that certificate, once filed, was to be effective.

At that meeting, the Alumax board, which consisted of 12 voting members, one-half of whom were elected by the class A common stock and one-half of whom were elected by the class B common stock, voted by class on the following 11 matters: (1) The election of new officers; (2) three capital appropriations for the expansion of two different facilities and the construction of a plant in amounts not in excess of $15,864,000, $2,413,000, and $250,686,000, respectively, that totaled $268,963,000 and that represented, by value, approximately 57 percent of the $469,159,525 of total capital appropriations and asset dispositions of Alumax during the period at issue; (3) the Alumax 5-year forecast for 1984 through 1988; (4) the Alumax capital expenditure plan for that 5-year period; (5) the Alumax 1984 profit plan; (6) the Alumax 1984 capital expenditure proposal; (7) the declaration of dividends; and (8) two matters relating to employee compensation plans.

On March 8, 1984, which also was prior to the date on which the 1984 restated certificate of incorporation was filed with the Delaware Secretary of State and was one of the occasions on which the Alumax board acted by unanimous consent either in lieu of a board meeting or at a special board meeting, the Alumax board, as it was structured prior to the 1984 restructuring, voted by class on certain matters relating to that restructuring (e.g., the amendment and restatement in the 1984 restated certificate of incorporation of the 1974 restated certificate of incorporation,

the amendment of the Alumax bylaws, the amendment in the 1984 stockholders agreement of the 1974 stockholders agreement, and the approval of the issuance of the Alumax class C common stock that was authorized by the 1984 restated certificate of incorporation). The holders of the class A common stock and the class B common stock also voted by class on the first two of the foregoing matters before the 1984 restated certificate of incorporation was filed with the Delaware Secretary of State.

During the period at issue, the director restricted matters on which the Alumax board voted pursuant to the director class voting requirement were: (1) The approval of a $100 million sale-leaseback transaction that represented, by value, approximately 21 percent of the $469,159,525 of total capital appropriations and asset dispositions of Alumax during the period at issue; (2) the reelection of Robert Marcus (Mr. Marcus) as the CEO and president of Alumax at Alumax board meetings held on April 20, 1984, April 26, 1985, and April 25, 1986; (3) the election of Paul Drack as interim president of Alumax on August 14, 1986, to succeed Mr. Marcus who resigned on August 12, 1986, effective as of August 15, 1986; and (4) the approval of a loan not in excess of $22,680,000 to Mitsui Japan and/or Mitsui USA.

During 1986, certain other matters on which the Alumax board voted by class were: (1) The amendments to the 1984 restated certificate on July 10, 1986, and on November 17, 1986, that related to the dividend provisions contained therein and that are

discussed above, and (2) the amendment and restatement of the 1984 restated certificate of incorporation and the Alumax 1984 bylaws and certain other matters, all of which occurred on November 21, 1986, and all of which related to the 1986 restructuring of Alumax discussed below. The foregoing amendments and/or restatements of the 1984 restated certificate of incorporation and the 1984 bylaws were required to be, and were, approved by the Alumax stockholders voting by class on those matters.

During the period at issue, the director nonrestricted matters on which the Alumax board voted pursuant to the director aggregate voting requirement included: (1) The election of officers other than the CEO; (2) a total of 28 capital appropriations and asset dispositions ranging from $1,300,000 to $9,798,000 that totaled $100,196,525 and that represented, by value, approximately 21 percent of the $469,159,525 of total capital appropriations and asset dispositions of Alumax during the period at issue; (3) the authorization of officers to enter into on behalf of Alumax (a) agreements with banks for commercial paper programs and/or lines of credit not in excess of $275 million and (b) long-term debt and/or swaps in excess of $100 million; (4) amendments to Alumax' thrift plans and retirement plans; (5) a $50 million contribution to a subsidiary of Alumax; and (6) the appointment of independent auditors.

Pursuant to a resolution that was adopted on April 21, 1983,

and that was in effect during the period at issue, the Alumax
board delegated to the president of Alumax the authority to
approve expenditures, within the approved capital expenditure
budget, in an amount not exceeding an aggregate of $1.5 million
per project, of which amount expenditures for capital assets
could not exceed $1 million and expenditures for working capital
could not exceed $500,000.

In connection with the 1984 restructuring, the Alumax bylaws
were amended. Those amended bylaws (i.e., the 1984 bylaws)
provided in pertinent part:

> In the absence of the Chairman of the Board and Vice
> Chairman of the Board, the President shall preside at
> all meetings of the Board of Directors and of the
> stockholders at which he shall be present; he shall be
> the chief executive officer and, except as herein
> provided, shall have general charge and supervision of
> the business of the corporation; and, in general, he
> shall perform all duties incident to the office of
> president of a corporation, and such other duties as,
> from time to time, may be assigned to him by the Board
> of Directors or as may be provided by law. At any time
> that any share of Class C Common Stock is outstanding,
> the President shall serve as a Special Class Director.

Thus, the individual who served as president of Alumax also
served as its CEO (president/CEO).

In connection with the 1984 restructuring, the Mitsui group
was granted certain rights that were expressly set forth in the
1984 stockholders agreement and either expressly set forth in the
1984 restated certificate of incorporation or incorporated into
that certificate by its reference to the 1984 stockholders agree-

ment.[7] The Mitsui group's rights were triggered at anytime on or before December 31, 1988, by the occurrence of any of certain specified events (specified events) that could have jeopardized the investment of that group in Alumax.[8] One of the specified events that would trigger those rights was the following:

> The Directors or stockholders of Alumax * * * take any action over the express objections of any Class B Director or the holder or holders of a majority of the outstanding shares of Class B Common Stock [viz., the Mitsui group], respectively, and within 14 calendar days after the taking of such action the Board of Directors of Mitsui Japan (or, if Mitsui Japan does not then own any shares of Class B Common Stock of Alumax, the Board of Directors of Mitsui U.S.A.) * * * review[s] such action and * * * adopt[s] a resolution stating that it has determined that such action could have a material and adverse impact on the value of such stockholder's stockholding in Alumax if it were to become effective.

If the resolution referred to in the foregoing provision were adopted, the action of the Alumax board to which a class B director objected or the action of the Alumax stockholders to which the Mitsui group stockholders objected would not become effective unless (1) Amax challenged the determination by the board of directors of Mitsui Japan or Mitsui USA that such an action could have a material and adverse impact on its investment in Alumax by notifying the Mitsui group of its challenge within 5

---

[7] Although Nippon Steel held 25 shares of the Alumax class B common stock, the 1984 stockholders agreement did not grant Nippon Steel rights similar to those granted to the Mitsui group.

[8] The Mitsui group's rights could be exercised by the Mitsui group at anytime after Dec. 31, 1988, without the occurrence of any of the specified events.

business days of its receipt of a notice that such a resolution had been adopted, and (2) Amax was successful in its challenge. If Amax timely provided the requisite notice of its challenge, a panel of three arbitrators (panel), each of whom was named in the 1984 stockholders agreement, was to determine by majority vote within 14 calendar days of that notice whether any action of the Alumax board to which a class B director objected or any action of the Alumax stockholders to which the Mitsui group stockholders objected could have a material and adverse impact on the value of the Mitsui group's stock in Alumax if it were to become effective.

If the panel were to decide that Amax' challenge was successful, the action of the Alumax board to which the class B director objected or the action of the Alumax stockholders to which the Mitsui group stockholders objected would become effective immediately, and the Mitsui group would not have the right to purchase any shares of the Alumax class C common stock. However, if for any reason the panel were not to reach a decision on Amax' challenge within the prescribed 14-day period, it would be deemed to have decided that Amax' challenge was unsuccessful. If the panel were deemed to have decided or were to decide that Amax' challenge was unsuccessful, the action of the Alumax board to which a class B director objected or the action of the Alumax stockholders to which the Mitsui group stockholders objected would not become effective, and the Mitsui group would have the

right to purchase between 51 and 100 percent of the outstanding shares of the Alumax class C common stock from Amax and/or its subsidiaries at a price equal to 50 percent of the stockholder's equity attributable to that stock (Mitsui's purchase right).  In the event that the Mitsui group were to exercise the right to purchase some or all of the Alumax class C common stock, the Amax group stockholders would have the right to prevent such purchase and to convert 100 percent of the Alumax class C common stock into the Alumax class A common stock which was to have the same rights as the class A common stock had prior to the 1984 restructuring (Amax' conversion right).[9]  In the event that the Amax group stockholders were to exercise that conversion right, the Mitsui group would no longer have the right to purchase any of the Alumax class C common stock held by Amax and/or its subsidiaries.  (We shall refer to the provisions in the 1984 stockholders agreement and in the 1984 restated certificate of incorporation relating to the rights granted to the Mitsui group with respect to actions of the Alumax board and the Alumax stockholders that the Mitsui group determined could have a material and adverse effect on its investment in Alumax as the objectionable action provision.)

The remaining specified events that would trigger the Mitsui

---

[9]  The Amax group stockholders had the right to exercise Amax' conversion right at any time after Dec. 31, 1988, without any prior action by the Mitsui group.

group's right under the 1984 stockholders agreement and the 1984 restated certificate of incorporation to purchase the Alumax class C common stock, subject to Amax' conversion right, were: (1) A downgrading below certain specified levels in the credit rating of certain securities of Amax or Alumax; (2) specified events triggering acceleration of certain indebtedness of Amax or Alumax; (3) certain events of bankruptcy or insolvency of any "significant subsidiary" of Amax; (4) certain changes in the ownership of Amax and/or the subsidiaries through which Amax held its shares of Alumax' stock; (5) a breach by Amax or Alumax of the 1984 stockholders agreement, the then effective certificate of incorporation of Alumax, the then effective bylaws of Alumax, the pledge and indemnity agreement, and/or the tax-sharing agreement (the last two of which are discussed below) "in a way materially adverse to" the class B stockholders' stock in Alumax; (6) a change that would cause the amount of obligations under the pledge and indemnity agreement to exceed the foreclosure value of the collateral pledged by Amax pursuant to that agreement; and (7) a change in generally accepted accounting principles that would prohibit Mitsui Japan and/or Mitsui USA from recording the net income of Alumax in its financial statements.

In connection with the 1984 restructuring, Amax and Alumax entered into an undated tax-sharing agreement (tax-sharing agreement) that was effective as of January 30, 1984. That agreement provided that for Federal income tax purposes: (1) Alumax was

required to pay Amax 90 percent of the tax liability of petitioners' group, determined as if petitioners' group were a separate consolidated group; (2) Amax was required to compensate Alumax if Alumax were adversely affected by the inclusion of petitioners' group in the Amax group; and (3) Alumax was required to compensate Amax if Alumax were to derive tax savings from the inclusion of petitioners' group in the Amax group.

In order to determine the separate Federal income tax liability of petitioners' group for purposes of the tax-sharing agreement, Alumax was required to, and did, prepare pro forma Forms 1120, U.S. Corporation Income Tax Returns (pro forma returns), for each of the years 1984, 1985, and 1986. Alumax was required to prepare those pro forma returns as the common parent of petitioners' group. Each such pro forma return was to be prepared by Alumax in such a manner as it deemed to be in its best interest as the common parent of petitioners' group, determined as if Alumax filed a consolidated return on behalf of that group for each of the years 1984, 1985, and 1986 and all prior taxable years (including taxable years prior to the inclusion of petitioners' group in the combined Amax group and petitioners' group), without regard to the tax position or interests of Amax or the Amax group. In this connection, the tax-sharing agreement provided in pertinent part:

> Notwithstanding the inclusion of the Alumax Consolidated Group [petitioners' group] in the Combined Consolidated Group [defined in paragraph D of the tax-

sharing agreement as the Amax group and petitioners' group together], for purposes of preparing such Pro Forma Alumax Return, Alumax shall be entitled to any and all elections, positions, and methods that would have been available to it in the computation of the tax liability of the Alumax Consolidated Group had it continued to file separate consolidated returns as common parent of the Alumax Consolidated Group. The Pro Forma Alumax Return will be delivered to Amax and to Mitsui U.S.A. together with a written description of the significant elections used in the preparation of such return no later than 30 days prior to the due date for the Combined Consolidated Return [defined in section 2 of the tax-sharing agreement as the consolidated Federal income tax return filed by Amax that included petitioners' group] (taking into account any extensions thereof that have been granted to AMAX). * * *

The tax-sharing agreement provided as follows with respect to the filing of certain tax returns and documents and the examination of those returns by the Internal Revenue Service (IRS):

AMAX shall prepare and file the Combined Consolidated Returns [defined in section 2 of the tax-sharing agreement as a consolidated Federal income tax return filed by Amax that included petitioners' group] and any other returns, amended returns and other documents or statements required to be filed with the Internal Revenue Service in connection with the determination of the federal income tax liability of the Combined Consolidated Group [defined in paragraph D of the tax-sharing agreement as the Amax group and petitioners' group together]. AMAX shall provide Alumax with copies of the portions of all such returns, documents and statements which are related to Alumax Consolidated Return Items [defined in section 6(a) of the tax-sharing agreement as items of income, deduction, gain, loss, and credit of petitioners' group] promptly upon filing thereof, and all calculations of the earnings and profits of the members of the Alumax Consolidated Group [petitioners' group] on an annual basis. * * *

While the parties recognize that AMAX will have primary responsibility with respect to the conduct of Internal Revenue Service examinations of the returns

filed by the Combined Consolidated Group and the AMAX Consolidated Group [the Amax group], Alumax shall have the sole and exclusive authority to contest, compromise or settle any proposed adjustment or assessed or asserted deficiency relating to or resulting from any Alumax Consolidated Return Item.  AMAX shall with respect to each taxable year for which a Combined Consolidated Return is filed and each Post-Consolidation Year for which the tax liability of the AMAX Consolidated Group is affected by Alumax Consolidated Return Items provide Alumax with an executed power of attorney, in a form satisfactory to Alumax, appointing persons designated by Alumax as attorneys-in-fact to represent AMAX before the Internal Revenue Service in connection with any examination of the return or initiation or conduct of any refund claim for that taxable year, to the extent related to Alumax Consolidated Return Items, and shall not revoke the power without first obtaining the written consent of Alumax.  AMAX shall promptly notify Alumax of and shall not object to any requests by the Internal Revenue Service to deal directly with any member of the Alumax Consolidated Group in the course of an audit.  AMAX shall not contest, compromise or settle any proposed adjustment or assessed or asserted deficiency relating to or resulting from an Alumax Consolidated Return Item or that would affect the Pro Forma Alumax Return [pro forma returns] * * * or the actual federal income tax liability of the Alumax Consolidated Group for any taxable year or seek a refund relating to an Alumax Consolidated Return Item without first obtaining the written consent of Alumax.  Alumax shall keep AMAX fully informed of the status of any contest concerning an Alumax Consolidated Return Item.

The tax-sharing agreement provided that it was to be binding upon and was to inure to the benefit of any successor, by merger, acquisition of assets, or otherwise, to any of the parties to the same extent as if the successor had been an original party to that agreement.

Also in connection with the 1984 restructuring, on or about March 9, 1984, (1) a pledge and indemnity agreement (pledge and

indemnity agreement) was entered into among the class B stock-holders, the class C stockholders, and The Bank of New York as trustee, and (2) a letter agreement (letter agreement) was entered into among Amax, Amax Realty, Bemax, Cemax, Amax Securities, Mitsui Japan, and Mitsui USA.

Pursuant to the pledge and indemnity agreement, the class C stockholders pledged their Alumax class C common stock, and, in the event that their Alumax class C common stock were converted into the Alumax class A common stock, their Alumax class A common stock, to be held in trust as security for the obligation of Amax to indemnify Alumax and the class B stockholders against certain tax and other costs that might arise out of the 1984 restated certificate of incorporation, the 1984 stockholders agreement, the tax-sharing agreement, and the transactions contemplated by any such agreements. Amax' obligation to indemnify Alumax against certain tax and other costs as set forth in section 1 of the pledge and indemnity agreement was as follows:

> Amax shall indemnify and hold harmless Alumax in the event that the Internal Revenue Service determines on examination of the federal income tax liability of the Alumax Consolidated Group [petitioners' group] or the Combined Consolidated Group [the Amax group and petitioners' group together] * * * for any taxable year (an "Examination Year") that the inclusion of the Alumax Consolidated Group in the Combined Consolidated Group in the Examination Year or any other taxable year was improper (an "Adverse Determination"). In the event of an Adverse Determination, * * * [Amax] shall repay as an indemnity to Alumax (i) the amount of any payments made by Alumax to Amax pursuant to the Tax Sharing Agreement with respect to the federal income tax liability of the Alumax Consolidated Group for such

Examination Year * * *, reduced by (ii) the amount of any payments made by Amax to Alumax pursuant to the Tax Sharing Agreement with respect to the federal income tax liability of the Alumax Consolidated Group for such Examination Year * * * plus interest thereon * * *. Amax shall further pay to Alumax the amount of any penalties or additions to tax paid by the Alumax Consolidated Group as a result of such Adverse Determination, including any interest payable by Alumax with respect thereto * * *. * * *

This Section 1 shall apply with equal force and effect to any state or local tax based on or measured by net income with respect to which Alumax makes payments to Amax pursuant to the * * * Tax Sharing Agreement.

Amax' obligation to indemnify the class B stockholders against certain tax and other costs as set forth in section 2 of the pledge and indemnity agreement was as follows:

Amax shall indemnify and hold harmless Mitsui U.S.A., Mitsui Japan and Nippon [Steel] jointly and severally against any federal, state or local taxes based on or measured by income, which would not have applied, or which are in excess of those which would have been imposed, if the * * * [1984 restructuring] had not occurred (other than:  * * * [inter alia, Federal income taxes relating to certain distributions by Alumax that were subject to the dividends-received deduction in the case of Mitsui USA and certain distributions of dividends that were taxed at a specified rate under the Income Tax Treaty between Japan and the United States]), including set-offs, expenses (including attorneys' fees), penalties, additions to tax, or interest to which any such indemnitee may become subject or for which any such indemnitee may become liable * * * with respect to or arising out of, directly or indirectly, * * * [the 1984 restructuring], the [1984] Stockholders agreement, the Tax Sharing Agreement, or any transaction contemplated by either of the above-named Agreements.

Pursuant to the pledge and indemnity agreement, Amax, and not Alumax or any other member of petitioners' group, was to have

control over any challenges by the IRS to the inclusion of petitioners in the consolidated return filed by Amax for each of the years 1984, 1985, and 1986.  That agreement stated:

     (a)(i)  If the Internal Revenue Service shall propose an adjustment in the tax liability of the Alumax Consolidated Group [petitioners' group] for which Amax would be required to pay an indemnity pursuant to Section 1 of this Agreement (a "Challenge to Consolidation"), then Alumax or Amax, whichever shall receive notice of the Challenge to Consolidation from the Internal Revenue Service, shall give prompt notice to the other of the Challenge to Consolidation.  Amax shall determine in its sole discretion whether to contest the Challenge to Consolidation, and, with respect to any such contest, shall determine the nature of all action to be taken to contest such Challenge to Consolidation including (A) whether any action to contest such Challenge to Consolidation shall be by way of judicial or administrative proceedings, or both, (B) whether any such Challenge to Consolidation shall be contested by resisting payment of the proposed adjustment or by paying the same and seeking a refund thereof, and (C) if Amax chooses to proceed through judicial proceedings, the court or other judicial body before which judicial action shall be commenced.  Amax shall have full control over any contest pursuant to this Section 3(a), but shall keep Alumax and the Mitsui Group informed of the status thereof and shall consider in good faith requests by them concerning the contest of the claim.

     (ii)  Notwithstanding paragraph (i) above, Alumax shall retain the rights specified in Section 6 of the Tax Sharing Agreement with respect to issues described therein other than whether the inclusion of the Alumax Consolidated Group in the Combined Consolidated Group [the Amax group and petitioners' group together] was proper. * * *

The pledge and indemnity agreement further provided, inter alia, that it was to terminate upon the earliest date on which all of the following conditions were met:  (1) No taxing authority was any longer entitled to propose an adjustment to any tax

liability of any party to the pledge and indemnity agreement (other than the trustee) for any year that could result in any amount's becoming due and payable pursuant to an obligation under that agreement; (2) no contest of any such proposed adjustment was pending; and (3) Amax did not have any obligations under the pledge and indemnity agreement to Alumax or the class B stock-holders.

The pledge and indemnity agreement provided that it and the rights and remedies thereunder were to inure to the benefit of and were to be binding upon the heirs, successors, and assignees to the parties thereto.

The letter agreement provided in pertinent part:

If the change currently proposed in Section 61 of H.R. 4170 (Tax Reform Act of 1984) is enacted, or if other United States federal tax legislation is enacted relating to the relationship between voting power and equity ownership and having a similar effect on Amax's ability to include the Alumax Consolidated Group * * * in Amax's consolidated federal income tax returns, and as a result either * * * [of the parties to the letter agreement] determine * * * that the likelihood of successfully contesting a possible challenge by the Internal Revenue Service to the inclusion by Amax of the Alumax Consolidated Group * * * in Amax's consolidated federal income tax return for any period is materially reduced, * * * [the parties to the agreement] agree to take such action as is necessary (including without limitation making appropriate amendments of Alumax's [1984] Restated Certificate of Incorporation) to convert all outstanding shares of Alumax Class C Common Stock into shares of Alumax Class A Common Stock upon the date which is the later of (i) the date of such determination (or as soon as practicable thereafter), or (ii) the last day preceding such period.

During August 1986, Amax Realty and Cemax were liquidated, and their respective assets, including the Alumax class C common stock, were distributed to Amax. Accordingly, all 250 shares of the Alumax class C common stock were thereafter held by Amax, Bemax, and Amax Securities.

The 1986 Restructuring and Subsequent Events

On November 24, 1986, Alumax filed with the Delaware Secretary of State a restated certificate of incorporation (1986 restated certificate of incorporation) that was effective as of that date (1986 restructuring). Alumax and its stockholders executed an agreement dated as of November 24, 1986, that, inter alia, terminated the 1984 stockholders agreement.

Pursuant to the 1986 restated certificate of incorporation, Alumax was authorized to issue (1) 750 shares of Alumax voting common stock with a par value of $100 a share and (2) 10 million shares of Alumax preferred stock (Alumax preferred stock) with a par value of $25 a share, which were to be issued from time to time by the Alumax board as shares of one or more series of stock with rights, preferences, and limitations as determined by the Alumax board. Four million shares of the Alumax preferred stock were designated by the Alumax board as series A nonvoting preferred stock (Alumax series A nonvoting preferred stock) and were exchangeable for the common stock of Amax.

On November 24, 1986, pursuant to a recapitalization and stock purchase agreement that was entered into among Amax,

Alumax, Mitsui USA, and Nippon Steel on or about November 13, 1986:  (1) Mitsui USA exchanged 57 shares of the Alumax class B common stock that it held for 4 million shares of the Alumax series A nonvoting preferred stock; (2) Mitsui USA sold to Amax for $291,500,000 the remaining 168 shares of the Alumax class B common stock that it held; and (3) Nippon Steel sold to Amax for $43,500,000 the 25 shares of the Alumax class B common stock that it held.  As a result of the 1986 restructuring, the outstanding shares of the Alumax class B common stock and the outstanding shares of the Alumax class C common stock were converted into a single class of Alumax common stock that was held entirely by members of the Amax group.[10]

During 1987 and 1988, Mitsui USA exchanged the 4 million shares of the Alumax series A nonvoting preferred stock that it held for an unspecified number of shares of the common stock of Amax.  Amax contributed that preferred stock to Alumax, which then canceled it.  During 1988, Mitsui USA sold in secondary public offerings all of the common stock of Amax that it held.

On November 15, 1993, Amax, which since the 1986 restructur-

---

[10]  Although the parties stipulated that, pursuant to the 1986 restated certificate of incorporation, "the Class A and Class B Common Stock of * * * [Alumax] was converted into a single class of common stock", we shall disregard that stipulation insofar as it refers to the Alumax class A common stock, rather than the Alumax class C common stock, because such reference is clearly contrary to the facts established by the record that, pursuant to that certificate, the Alumax class B common stock and the Alumax class C common stock were converted into a single class of Alumax stock.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

- 37 -

ing had owned 100 percent of the outstanding shares of the Alumax common stock, distributed to its common stockholders all of the Alumax common stock that it held, and Alumax has been publicly held since that time.  Immediately thereafter, Amax was merged into Cyprus Minerals Company, and the surviving company and successor to Amax was renamed Cyprus Amax Minerals Company (Cyprus Amax).

Filing and Examination of the Consolidated Returns

Alumax filed consolidated returns for the calendar years 1981 and 1983 as the common parent of petitioners' group, an affiliated group within the meaning of section 1504(a).

Amax filed consolidated returns for 1984, 1985, and 1986 on September 15, 1985, September 15, 1986, and September 15, 1987, respectively, in which it claimed to be the common parent of an affiliated group within the meaning of section 1504(a) that consisted of corporations in both the Amax group and petitioners' group.  As part of the 1984 consolidated return that it filed, Amax included the following documents:  (1) Form 851 (Affiliations Schedule) that listed the corporations that were included in the 1984 consolidated return, including the corporations in petitioners' group; (2) a document dated August 12, 1985, entitled "ELECTION TO BE A MEMBER AS OF JANUARY 1, 1984" (election document), that was signed by John A. Brader as vice president of Alumax, and that provided:

Based on an Agreement dated January 30, 1984 by and among Alumax Inc., AMAX Inc., Mitsui and Co., Ltd. and Mitsui and Co. (U.S.A.) Inc. as amended that gives AMAX Inc. 80% of the voting power of all classes of Alumax stock entitled to vote, Alumax and each of its subsidiaries hereby elects under United States Treasury Regulations Section 1.1502-76(b)(5)(i) to become a member of the group of which AMAX Inc. is the common parent as of January 1, 1984[;]

and (3) a "Disclosure Statement under Section 6661 of the Internal Revenue Code" that was required to be filed as part of that return in accordance with an agreement between Amax and Mitsui USA and that provided:

An Agreement dated January 30, 1984 by and among Alumax Inc., AMAX Inc., Mitsui & Co. Ltd. and Mitsui & Co. (U.S.A.), Inc. as amended (a copy of which is attached hereto) gives AMAX Inc. 80% of the voting power of all classes of Alumax stock entitled to vote. * * * Based on the Agreement Alumax and each of its subsidiaries has elected under United States Treasury Regulations Section 1.1502-76(b)(5)(i) to become a member of the group of which AMAX Inc. is the common parent as of January 1, 1984. Accordingly, Alumax and each of its subsidiaries is included as of January 1, 1984 in the AMAX Inc. Consolidated Income Tax Return filed for the year ended December 31, 1984.

As a result of the inclusion of petitioners' group in the consolidated returns filed by Amax for 1984, 1985, and 1986, (1) the taxable income of petitioners' group for each of those years was offset in the computation in those returns of the consolidated taxable income by net operating losses of members of the Amax group; and (2) general business credits (credits) under section 38 of petitioners' group for each of the years 1984, 1985, and 1986 (consisting of investment tax credits for those years and jobs credits for 1984 and 1985) were carried back

pursuant to section 39 to 1981 and 1983 in the respective amounts of $5,663,086 and $11,454,565, resulting in Alumax' receipt of tax refunds in those amounts pursuant to section 6411.

The consolidated return filed by Amax for each of the years 1984, 1985, and 1986 constituted the return of each member of petitioners' group for each such year, regardless whether the inclusion of petitioners in each of those consolidated returns was proper. The respective periods of limitations on the assessment of tax against petitioners' group for each of the years 1984, 1985, and 1986 began to run on the date on which Amax filed the consolidated return for each such year.

Respondent commenced an examination of the consolidated returns that Amax filed for 1984, 1985, and 1986. Prior to the expiration of the time prescribed by section 6501 for the assessment of income tax due for each of those years from the corporations that were included, whether properly or improperly, in those consolidated returns (Amax consolidated group), Amax and respondent executed the following 11 separate written agreements on Forms 872 (Consent to Extend the Time to Assess Tax) to extend the period of time during which any such assessment could be made by respondent:

| Taxable Year(s) to which Form 872 Applied | Date through which Period of Limitations Was Extended | Date Signed by Officer of Amax | Date Signed by Representative of Respondent |
|---|---|---|---|
| 1984 | Dec. 31, 1988 | Dec. 24, 1987 | Mar. 3, 1988 |
| 1983 through 1985 | Dec. 31, 1989 | Aug. 1, 1988 | Aug. 15, 1988 |
| 1983 through 1985 | June 30, 1990 | June 20, 1989 | July 5, 1989 |
| 1984 | June 30, 1991 | Undated | Mar. 30, 1990 |

| 1985 | June 30, 1991 | Undated | Mar. 30, 1990 |
| 1986 | June 30, 1991 | Undated | Mar. 30, 1990 |
| 1983 through 1986 | June 30, 1992 | Undated | May 6, 1991 |
| 1983 through 1986 | Dec. 31, 1992 | Undated | Jan. 24, 1992 |
| 1983 through 1986 | June 30, 1993 | Aug. 31, 1992 | Sept. 3, 1992 |
| 1983 through 1986 | Dec. 31, 1993 | Jan. 28, 1993 | Jan. 29, 1993 |
| 1983 through 1986 | Dec. 31, 1994 | Sept. 14, 1993 | Sept. 15, 1993 |

Each of the above-listed Forms 872 identified the "tax-payer(s)" as "Amax Inc. and Consolidated Subsidiaries" or "Amax Inc. and Consolidated Subs" and stated in pertinent part that the taxpayers so identified and a designated representative of respondent "consent and agree to the following:"

> (1)  The amount of any Federal [income] tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended [December 31, 1983, December 31, 1984, December 31, 1985, and/or December 31, 1986] may be assessed at any time on or before [one of the dates stated on the Form 872 and listed above].  * * *

After the merger of Amax into Cyprus Minerals Company on or around November 15, 1993, and before the expiration of the time prescribed by section 6501 for the assessment of income tax due for 1984, 1985, and 1986 from the corporations in the Amax consolidated group, Cyprus Amax, the surviving company of that merger and the successor to Amax, and respondent executed a written agreement on Form 872 to extend the period of time through June 30, 1995, during which any such assessment could be made by respondent.  That Form 872 identified the "taxpayer(s)" as "Amax, Inc. and Consolidated Subsidiaries" and stated in pertinent part that the taxpayers so identified and a designated representative of respondent "consent and agree" that the "amount

of any Federal INCOME tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended December 31, 1983, December 31, 1984, December 31, 1985 and December 31, 1986 may be assessed at any time on or before June 30, 1995." That Form 872 was signed on June 23, 1994, by an officer of Cyprus Amax, and on June 27, 1994, by a representative of respondent.

The officers of Amax and Cyprus Amax who signed the Forms 872 in question were not at any relevant times officers of Alumax or of any other member of petitioners' group. Neither Alumax nor any other member of petitioners' group executed at any relevant times a written power of attorney or any other document explicitly referring to a power of attorney, which specifically authorized any of those officers to represent Alumax or any other member of petitioners' group with respect to the years 1984, 1985, and 1986.

On March 15, 1995, respondent issued a notice of deficiency (notice) to Alumax, Incorporated and Consolidated Subsidiaries. In the notice, respondent determined, inter alia:

> you are not qualified for inclusion in Amax, Inc.'s affiliated group for the taxable years ended December 31, 1984, December 31, 1985 and November 24, 1986, because Amax, Inc. did not satisfy the requirements of I.R.C. §1504(a) during any portion of said taxable years.

> * * * * * * * *

> Accordingly, you are treated as filing separate income tax returns for the years ended December 31, 1984, December 31, 1985 and November 24, 1986. Your income is figured as disclosed by the consolidated returns of

Amax, Inc. and subsidiaries, and by reference to pro forma returns (Form 1120), prepared by you and submitted to Amax, Inc., as if you were separate from Amax, Inc., and still the common parent of your own consolidated group.

 * * * * * * * *

Because of the determination that Alumax, Inc. and consolidated subsidiaries, are not included in the consolidated returns of Amax, Inc. for the taxable years ended December 31, 1984, December 31, 1985, and November 24, 1986, there is sufficient tax available to absorb * * * [the] credits. Therefore, the credits are not allowed as carrybacks.

Petitioners bear the burden of establishing that respondent's determinations in the notice are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). That this case was submitted fully stipulated does not change that burden or the effect of a failure of proof. Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

Consolidation

Section 1501 grants an affiliated group of corporations the privilege of filing a consolidated return. The dispute here centers on whether for each of the years 1984, 1985, and 1986 petitioners were members of the affiliated group that had Amax as its common parent, which filed a consolidated return for each of those years that included petitioners. The term "affiliated group" is defined in section 1504(a). The Deficit Reduction Act of 1984 (1984 Act), Pub. L. 98-369, sec. 60(a), 98 Stat. 577-579, amended the definition of an "affiliated group" in section 1504(a) (amended section 1504(a)). Amended section 1504(a) is

generally effective for taxable years beginning after December 31, 1984.  1984 Act, sec. 60(b)(1), 98 Stat. 579.

Prior to its amendment by the 1984 Act, section 1504(a), as pertinent here, defined the term "affiliated group" to mean

one or more chains of includible corporations connected through stock ownership with a common parent corpora- tion which is an includible corporation if--

(1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (ex- cept the common parent corporation) is owned di- rectly by one or more of the other includible corporations; and

(2) The common parent corporation owns di- rectly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations.

After its amendment by the 1984 Act, section 1504(a), as pertinent here, defined the term "affiliated group" as follows:

(1) In General.--The term "affiliated group" means--

(A) 1 or more chains of includible corpora- tions connected through stock ownership with a common parent corporation which is an includible corporation, but only if--

(B)(i) the common parent owns directly stock meeting the requirements of paragraph (2) in at least 1 of the other includible corporations, and

(ii) stock meeting the requirements of paragraph (2) in each of the includible cor- porations (except the common parent) is owned directly by 1 or more of the other includible corporations.

(2) 80-percent voting and value test.--The owner-ship of stock of any corporation meets the requirements of this paragraph if it--

(A) possesses at least 80 percent of the total voting power of the stock of such corpora-tion, and

(B) has a value equal to at least 80 percent of the total value of the stock of such corpora-tion.

As pertinent here, the principal difference between section 1504(a) and amended section 1504(a) is that the definition of the term "affiliated group" in the latter provision imposes an 80-percent value test in addition to the 80-percent voting power test that is imposed by both provisions.  Compare sec. 1504(a) with amended sec. 1504(a).

Section 60(b)(2) of the 1984 Act, 98 Stat. 579, as amended retroactively by section 1804(e)(2) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2800, provides the following special rule for the effective date of amended section 1504(a) (special effective date rule):

(2) Special Rule for Corporations Affiliated on June 22, 1984--In the case of a corporation which on June 22, 1984, is a member of an affiliated group which files a consolidated return for such corporation's taxable year which includes June 22, 1984, for purposes of determining whether such corporation continues to be a member of such group for taxable years beginning before January 1, 1988, the amendment made by subsection (a) [viz, amended section 1504(a)] shall not apply.  The preceding sentence shall cease to apply as of the first day after June 22, 1984, on which such corporation does not qualify as a member of such group under section 1504(a) the Internal Revenue Code of 1954 (as in effect on the day before the enactment of this [1984] Act).

On brief, the parties proceed on the assumption that section 1504(a) applies not only for 1984 but also for 1985 and 1986 and that amended section 1504(a) does not apply for 1985 and 1986. Consequently, they make no argument, and presumably they did not present all the evidence that they might have, with respect to the 80-percent value test in amended section 1504(a)(1)(B) and (2)(B). While we agree that section 1504(a) is applicable for 1984, we disagree that that section applies for 1985 and 1986. That is because we find below that for 1984 petitioners were not members of the affiliated group within the meaning of section 1504(a) that had Amax as its common parent. Accordingly, the special effective date rule does not apply, and the question whether for 1985 and 1986 petitioners were members of the affiliated group that had Amax as its common parent must be resolved under amended section 1504(a).

Since the parties address for each of the years 1984, 1985, and 1986 only the 80-percent voting power test of section 1504(a) before its amendment by the 1984 Act, and since that test, as pertinent here, is essentially the same as the 80-percent voting power test of section 1504(a) after its amendment by the 1984 Act, compare sec. 1504(a) with amended sec. 1504(a)(1)(B) and (2)(A), we generally shall do the same. However, we are in no way suggesting that that is the only test that petitioners must satisfy for 1985 and 1986 in order to be members of the affili-

ated group that had Amax as its common parent. Nor are we suggesting that petitioners have carried their burden of showing that they satisfy the 80-percent value test of amended section 1504(a)(1)(B) and (2)(B). To the contrary, on the record before us, we find that they have not.

The dispute as framed by the parties is whether the Alumax class C common stock owned by the Amax group stockholders possessed "at least 80 percent of the voting power of all classes of stock" of Alumax within the meaning of section 1504(a)(1).[11]

It is petitioners' position that at all relevant times the Alumax class C common stock possessed 80 percent of the voting power of all classes of Alumax stock within the meaning of section 1504(a)(1). It is significant to our resolution of the question presented under section 1504(a)(1) and amended section 1504(a) that petitioners do not contend that that stock possessed more than 80 percent of the voting power of all classes of Alumax stock. Petitioners argue that "all judicial and administrative

---

[11] Each party, and in particular petitioners, appears to have misconstrued in material respects the arguments on brief of the opposing party on the issue under sec. 1504(a)(1). As a result, the briefs, and in particular petitioners' briefs, often address arguments and contentions that we do not believe are even being advanced by the opposing party. In any event, we shall resolve the issue presented to us under sec. 1504(a)(1) and amended sec. 1504(a) by following the path mandated by the facts established by the record and the applicable law.

authorities"[12] that have construed the meaning of the terms

"voting stock" and/or "voting power" for purposes of section

1504(a) and its predecessor provisions in the Internal Revenue

laws support their position under section 1504(a)(1).  According

to petitioners, those cases and rulings

> consistently have defined "voting stock" as stock that
> has the right to vote in the election of directors and
> have measured a stock's "voting power" by reference to
> the voting power of the directors such stock elects.
> They have specifically not taken into account voting
> rights with respect to matters other than the right to
> vote in the election of directors, no matter how exten-
> sive such rights may be, and have never measured voting
> power other than by reference to the voting power of
> directors. * * *

(We shall refer to the test that petitioners contend all perti-

nent case law and rulings require us to apply in resolving the

question presented under section 1504(a)(1) as the mechanical

test.)

According to petitioners, application of their mechanical

test mandates the following conclusions:

---

[12]  The so-called "administrative authorities" on which petition-
ers, as well as respondent, rely include various rulings, both
published and private, that the IRS has issued.  (We shall refer
collectively to those rulings as rulings.)  Revenue rulings are
not regarded as precedent in this Court.  They merely represent
the position of the Commissioner of Internal Revenue (Commis-
sioner) on a particular issue.  Lucky Stores, Inc. and Subs. v.
Commissioner, 105 T.C. 420, 433 (1995).  However, the public
generally has the right to rely on positions taken by the Commis-
sioner in revenue rulings.  Nissho Iwai Am. Corp. v. Commis-
sioner, 89 T.C. 765, 778 (1987).  Private letter rulings are not
regarded as precedent in this Court, and the public may not rely
on them.  See sec. 6110(j)(3); Shelton v. Commissioner, 105 T.C.
114, 119 (1995).

The Class C stock owned by the Amax Group entitled the Amax Group to elect four directors who could cast 8 out of 10 votes cast on matters put to the Board. The Amax Group, therefore, had 80 percent of the "voting power" of the stock of Petitioner.

In reaching the foregoing conclusions about the voting power of the class C directors and the Alumax class C common stock that elected those directors, petitioners must, and do, carve out an exception to the application of their mechanical test. Instead of assigning to the Alumax class C common stock, as their mechanical test would require, the voting power of the class C directors on all matters on which the Alumax board was to vote, petitioners assign to that stock the voting power of those directors only on the director nonrestricted matters on which the Alumax board voted in the aggregate, and not by class. Petitioners thus ignore the reduced voting power of the class C directors and the increased voting power of the class B directors on the director restricted matters that required a class vote, and consequently a 50/50 vote, by the class C directors who were elected by the Amax group stockholders and by the class B directors who were elected by the Mitsui/Nippon group stockholders.[13]

---

[13] Petitioners also disregard the voting power of the Alumax class B common stock and the Alumax class C common stock on the stockholder restricted matters, which are identical to the director restricted matters and on which a class vote was required by each of those two classes of stock. Indeed, petitioners do not even refer to that stockholder class voting requirement in advancing their arguments under sec. 1504(a)(1) in their opening brief. It is only in their reply brief that petitioners

(continued...)

In support of the exception that they carve out of their mechanical test, petitioners assert:

> The six matters requiring approval of each class of directors in the case of Alumax covered a narrow set of actions, such as mergers, material acquisitions and dispositions and transactions with affiliates, that frequently are the subjects of mechanisms, such as class voting, intended to protect minority stockholders.  * * *  They fall far short of the unlimited list of matters on which the preferred stockholders could have voted in <u>Erie Lighting</u> [<u>Co. v. Commissioner</u>, 93 F.2d 883 (1st Cir.), revg. 35 B.T.A. 906 (1937)], or would have been prevented from voting on in [<u>Rudolph</u>] <u>Wurlitzer</u> [<u>Co. v. Commissioner</u>, 81 F.2d 971 (1936), affg. 29 B.T.A. 443 (1933)], had those stockholders known of and tried to exercise their voting rights.

In urging application of their mechanical test, petitioners not only contend that the Court should ignore the respective director and stockholder class voting that was required on the director and stockholder restricted matters, they also assert that we should disregard (1) the mandatory dividend provision and (2) the objectionable action provision.  That is because, accord-

---

[13]  (...continued)
appear to address that requirement.  Although not altogether clear to us, it appears, and we shall assume, that petitioners contend in their reply brief that the stockholder class voting requirement should be ignored for purposes of sec. 1504(a)(1) for the same reasons that petitioners claim the director class voting requirement should be ignored.  Apparently, petitioners' position with respect to the stockholder class voting requirement also was difficult for the IRS to grasp.  We draw this conclusion because in Tech. Adv. Mem. 94-52-002 (Aug. 26, 1994), which was issued by the IRS to petitioners on the question under sec. 1504(a)(1) presented here, the IRS noted that petitioners had taken inconsistent positions as to whether "the Charter required each class of shareholders to approve the Restricted Matters, at times seeming to acknowledge the existence of this requirement and most recently disputing its existence."

ing to petitioners, all the pertinent cases and rulings (1) reject any "argument that a preferential right to dividends [like that which petitioners maintain was granted by the mandatory dividend provision] gives the holders of the stock some of the 'voting power' of the stock not entitled to that preference" and (2) determined voting power

> on the basis of actual voting power at the time of
> measurement, and * * * any possibility that voting
> power might change as a result of an event, such as the
> conversion of non-voting stock into voting stock or a
> purchase or redemption of stock [like that which peti-
> tioners contend might occur under the objectionable
> action provision], even if scheduled to occur, was
> irrelevant [under those cases and rulings]. * * *

Petitioners further argue, in the alternative, that even if the Court were to consider the director and stockholder class voting requirements, the mandatory dividend provision, and the objectionable action provision in resolving the issue presented under section 1504(a)(1), the voting power of the Alumax class C common stock would not be reduced below the 80-percent voting power which petitioners contend that stock possessed. That is because, according to petitioners, those requirements and provisions did not "meaningfully impair the power of the [Alumax] Board, operating through the Class C Directors, to manage the business and affairs of Petitioner [Alumax]."

Respondent counters that at all relevant times the Alumax class C common stock did not possess at least 80 percent of the voting power of all classes of Alumax stock within the meaning of

section 1504(a)(1).  Respondent contends that although in

> the vast majority of cases applying section 1504(a),
> voting power can and should be measured by reference to
> the election of directors * * *, in an aggressively
> structured transaction like the instant case, election
> of directors is not an appropriate measure of voting
> power.  In such a case, the Service will look beyond
> the election of directors to determine voting power.

Respondent argues that "all judicial and administrative authorities" that have construed the meaning of the terms "voting stock" and/or "voting power" for purposes of section 1504(a) and its predecessor provisions in the Internal Revenue laws support respondent's position in the present case.  According to respondent, those cases and rulings "disavow [petitioners'] * * * purely mechanical test as the proper standard for voting power under section 1504(a)."  While acknowledging that the pertinent case law and rulings require the Court in the present case to consider the right of the Alumax class C common stock to elect the class C directors and the voting power of those directors in resolving the issue presented under section 1504(a)(1), respondent contends that those cases and rulings also permit us in the instant case to examine the voting power of the class C directors on all board matters, not, as petitioners urge, just on those board matters on which the directors were to vote in the aggregate, and not by class.  Respondent further contends that we must also consider the impact of the class voting required by the Alumax stockholders on the same restricted matters on which the

Alumax directors were required to vote by class, since that stockholder class voting requirement gave the Alumax class B common stock veto power over both the Alumax class C common stock and the class C directors whom that class C stock elected.

Respondent also urges the Court to examine the impact of the mandatory dividend provision and the objectionable action provision in resolving the issue presented under section 1504(a)(1). That is because, according to respondent, those provisions placed restrictions on the power of the Alumax board to act on certain board matters and, consequently, on the voting power of the Alumax class C common stock, which elected the class C directors on that board, to participate in the management of Alumax through those directors.

It is respondent's position that the cumulative effect of the director class voting requirement, the stockholder class voting requirement, the mandatory dividend provision, and the objectionable action provision was to reduce the voting power of the Alumax class C common stock well below 80 percent for purposes of section 1504(a)(1).

Since both parties rely on essentially the same case law and rulings to support their divergent positions, it is obvious that one of the parties is misconstruing them. We conclude that petitioners are incorrectly interpreting the cases and rulings in question. The only issue presented in the cases (viz, Erie Lighting Co. v. Commissioner, 93 F.2d 883 (1st Cir.), revg. 35

B.T.A. 906 (1937), and <u>Rudolph Wurlitzer Co. v. Commissioner</u>, 81 F.2d 971 (6th Cir. 1936), affg. 29 B.T.A. 443 (1933)), on which both parties rely was whether the stock in question was voting stock or nonvoting stock for purposes of the applicable consolidation provisions. Those cases did not even address how to measure the voting power possessed by different classes of voting stock for purposes of those provisions. The questions presented in certain of the rulings on which both parties rely (viz, Rev. Rul. 69-126, 1969-1 C.B. 218; I.T. 3896, 1948-1 C.B. 72) were whether the stock in question was voting stock or nonvoting stock for purposes of the applicable consolidation provisions and how to measure the voting power possessed by different classes of voting stock for purposes of those provisions. One or both of those issues also were involved in certain of the other rulings on which petitioners rely (e.g., Rev. Rul. 71-83, 1971-1 C.B. 268; Priv. Ltr. Rul. 90-26-047 (Mar. 30, 1990); Priv. Ltr. Rul. 83-42-014 (July 10, 1983); Priv. Ltr. Rul. 82-21-112 (Feb. 26, 1982)).

None of the cases or rulings on which petitioners rely involved the facts presented in the instant case. Nor does any of them mandate that we adopt petitioners' espoused mechanical test, let alone their application of that test, in determining in the present case whether the Alumax class C common stock owned by the Amax group stockholders satisfies the voting power requirement of section 1504(a)(1) and amended section 1504(a)(1)(B) and

(2)(A).[14] To the contrary, Erie Lighting Co. v. Commissioner,

supra, the principal case on which both parties rely, supports

respondent's position that, in the present case, this Court

should examine all of the facts surrounding the management of

Alumax and the voting rights of the Alumax class B common stock,

the Alumax class C common stock, the Alumax board, and the

members of that board in order to determine whether the Alumax

class C common stock owned by the Amax group stockholders pos-

sessed "at least 80 percent of the voting power of all classes of

[Alumax] stock" within the meaning of section 1504(a)(1).

In Erie Lighting Co. v. Commissioner, supra, the court

addressed whether the preferred stock issued by the Erie Lighting

Company (ELC) was voting stock or nonvoting stock for purposes of

the applicable consolidation provisions.  In resolving that

issue, the court observed:

> The purpose of the provisions relating to affili-
> ated companies was to enable corporations under one
> management to make a consolidated return as though they
> were a unit in transacting business, and to avoid such
> a manipulation of intercompany transactions as would

---

[14] Petitioners do not cite Hermes Consol., Inc. v. United
States, 14 Cl. Ct. 398 (1988), even though they contend that if
respondent's position were adopted in the present case, the
application of many other Code provisions requiring "precise,
percentage determinations of voting power" would be called into
question.  In Hermes, the court determined the voting power of
certain stock for purposes of sec. 269(a) by examining its right
to vote in the election of directors and its right to approve or
disapprove fundamental changes in corporate structure, although
the court acknowledged that the former factor was "more indica-
tive" of that voting power than the latter factor.  Id. at 405-
407.

prevent the government from correctly ascertaining and collecting the sums as taxes that are justly due it. Schlafly v. United States, * * * [4 F.2d 195 (8th Cir. 1925)] 8 Cir., 4 F.2d 195 at page 200; Atlantic City Electric Co. v. Commissioner, 288 U.S. 152, 154, 53 S.Ct. 383, 384, 77 L.Ed. 667.

The Commissioner and the Board, in the construction of the acts prior to 1926, generally, whenever the question was raised, followed this rule, that the stock which must be taken into consideration in determining whether grounds for affiliation exist, was stock having a right to control the management of a corporation, as in the election of directors.

With such an established and recognized construction by the Department, Congress in enacting the 1926 and 1928 acts should be held to mean by "nonvoting stock" stock not having the right to vote for directors who control the management of the corporation. * * *

* * * * * * *

"Voting stock may very properly be termed management stock." * * * [Erie Lighting Co. v. Commissioner, supra at 884-885.]

The court in the Erie Lighting Co. case also quoted with approval the following statement in Commissioner v. Shillito Realty Co., 39 F.2d 830, 832 (6th Cir. 1930), affg. 8 B.T.A. 665 (1927):[15]

---

[15] Petitioners contend on brief that the analysis in Commissioner v. Shillito Realty Co., 39 F.2d 830 (6th Cir. 1930), affg. 8 B.T.A. 665 (1927), "conflicts with, and must therefore yield to, [the analysis] * * * of two subsequent decisions of the Supreme Court," viz, Atlantic City Elec. Co. v. Commissioner, 288 U.S. 152 (1933), and Burnet v. Howes Bros. Hide Co., 284 U.S. 583 (1931) (per curiam). Not only did the court in Erie Lighting Co. v. Commissioner, 93 F.2d 883 (1st Cir.), revg. 35 B.T.A. 906 (1937), the principal case on which petitioners rely to support their mechanical test, quote with approval the above statement from the Shillito case, it expressly found that that statement was "in no way opposed" to the Supreme Court decision in Handy & Harman v. Burnet, 284 U.S. 136 (1931), the controlling authority on which the Supreme Court relied in deciding the Atlantic City

(continued...)

We think the term "stock," as used in the [consolidation] statute, is clearly intended to mean stock with a potential voting power which, if asserted, will be effective in the management or control of the corporation. [Erie Lighting Co. v. Commissioner, supra at 886.]

With the foregoing in mind, the court in Erie Lighting Co. v. Commissioner, supra, proceeded to examine the facts before it, including the nature of the matters on which the preferred stock of ELC had the right to vote, and made certain judgments about the nature of those various matters. Based on that examination, the court found that the ELC preferred stock had the right to vote on many matters that it determined were "usually reserved to the stockholders" (stockholder matters) but that it did not have the right to vote in the election of ELC's board of directors, unless dividends with respect to that preferred stock remained unpaid for two quarterly periods, a condition that had not arisen during the years in question. Id. at 883, 885. The matters that the court in Erie Lighting Co. determined were "usually reserved to the stockholders" included increases or reductions of capital stock of the company, increases in its capital indebtedness, the number of directors serving on ELC's board of directors, the place of its principal office, and the time of its stockholder

---

[15] (...continued)
Elec. Co. and Howes Bros. Hide Co. cases. Erie Lighting Co. v. Commissioner, supra at 886.

meetings.[16]  Id. at 885.  The court in Erie Lighting Co. did not
indicate that any of those stockholder matters on which the
preferred stockholders of ELC had the right to vote restricted
ELC's board of directors with respect to that board's management
of ELC's business and affairs.  Nor did it make mention of any
management matter that it believed was taken away from ELC's
board of directors by those stockholder matters.  To the con-
trary, the court in Erie Lighting Co. examined applicable State
law and the bylaws of ELC, found that under that law and those
bylaws the board of directors of ELC was entrusted with the
management of its business and affairs, and distinguished the
management matters that were entrusted to ELC's board of direc-
tors from the stockholder matters on which the preferred stock-
holders of ELC had the right to vote.  The court in Erie Lighting
Co. v. Commissioner, 93 F.2d at 885, concluded that those stock-
holder matters

> are not a basis for holding that two corporations do
> business as a single unit, or that the preferred stock-
> holders control the management of the business enter-
> prise.  That is left to the board of directors.

---

[16]  It appears to us that (1) certain of the matters that the
court in Erie Lighting Co. v. Commissioner, supra, determined
were "usually reserved to the stockholders" were the types of
matters that under the laws of all States required a stockholder
vote or stockholder approval, and (2) the remainder of those
matters were the types of matters that under the laws of certain
States required a stockholder vote or stockholder approval.  See
2 Fletcher Cyclopedia of Corporations, secs. 276, 543, 547 (perm.
ed. 1990 rev.); 5 Fletcher Cyclopedia of Corporations, supra
secs. 2001, 2105 (perm. ed. 1996 rev.).

The court held in <u>Erie Lighting Co. v. Commissioner</u>, <u>supra</u> at 885-886, that the preferred stock of ELC was not voting stock for purposes of the applicable consolidation provisions because that stock did not have the right to vote in the election of the board of directors of ELC, which was entrusted with the management of its business affairs, and therefore that stock did not have the right to control that management.

Since <u>Erie Lighting Co. v. Commissioner</u>, <u>supra</u>, was decided, pertinent rulings have, consistent with the rationale of the <u>Erie Lighting Co.</u> case, considered the ability of stock to participate in the management of a corporation through the election of one or more directors in determining the existence of voting stock and/or the extent of voting power for purposes of the consolidation provisions. See, e.g., Rev. Rul. 69-126, 1969-1 C.B. 218; I.T. 3896, 1948-1 C.B. 72. However, none of those rulings involved the facts presented here. Nor did any of them suggest that the power of the boards of directors involved in those rulings, or of the members of those boards, was restricted or limited, such as by completely taking away from those boards the power to vote on certain matters relating to the management of corporate business and affairs that were entrusted to those boards under the applicable State law or by requiring a class vote by different members of those boards on such board management matters.

Based on our examination of <u>Erie Lighting Co. v. Commissioner</u>, <u>supra</u>, and other pertinent authorities, we conclude that, in the present case, we are not precluded from examining the impact, if any, of the respective director and stockholder class voting requirements, the mandatory dividend provision, and the objectionable action provision on the power of the Alumax class C common stock to participate in the management of Alumax, directly and/or indirectly through the class C directors whom that stock elected, and, therefore, on the voting power of that stock for 1984 for purposes of section 1504(a)(1) and for 1985 and 1986 for purposes of amended section 1504(a)(1)(B) and (2)(A).  See <u>Erie Lighting Co. v. Commissioner</u>, <u>supra</u>; see also Rev. Rul. 69-126, <u>supra</u>; I.T. 3896, <u>supra</u>.

Before turning to an examination of those matters, we shall set forth our views about the experts on whom the parties rely. Petitioners rely on the opinions of R. Franklin Balotti (Mr. Balotti) who is qualified as an expert on the general corporation law of the State of Delaware and on the corporate governance and capital structure of Delaware corporations and business organizations and who prepared an opening report and a rebuttal report (collectively referred to as Mr. Balotti's reports).  Respondent relies on the opinion of Bernard S. Black (Mr. Black) who is qualified as an expert on corporate law, mergers and acquisitions, and corporate finance and who also prepared an opening

report and a rebuttal report (collectively referred to as Mr. Black's reports).

We evaluate the opinions of experts in light of the qualifications of each expert and all other evidence in the record. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'" Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and remanding in part T.C. Memo. 1983-200). We shall disregard any opinion of an expert that constitutes nothing more than that expert's legal opinion or conclusion about a particular matter. See Marx & Co. v. Diners' Club Inc., 550 F.2d 505, 508-512 (2d Cir. 1977); Laureys v. Commissioner, 92 T.C. 101, 127-129 (1989). We are not bound by the formulae and opinions proffered by an expert, especially when they are contrary to our own judgment. Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139. Instead, we may reach a decision based on our own analysis of all the evidence in the

record.  Silverman v. Commissioner, supra at 933.  The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based.  See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion.  Parker v. Commissioner, supra at 562.  We also may reject the opinion of an expert witness in its entirety.  See Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Parker v. Commissioner, supra at 562-565.

## Mr. Balotti's Reports

We found the focus of Mr. Balotti's reports to be in large part misdirected.  Mr. Balotti's reports focus primarily on whether the director class voting requirement, the stockholder class voting requirement, the mandatory dividend provision, and the objectionable action provision prevented the board of Alumax from managing its business and affairs.  He concludes that those requirements and provisions did not "significantly alter or impair" the power of the Alumax board to manage the business and affairs of Alumax or the exercise of such power.  However, it is respondent's position that the director class voting requirement caused the Alumax board's power with respect to the restricted

matters to be divided equally between the class B directors and the class C directors, not that that requirement impaired the Alumax board's power to manage the business and affairs of Alumax. Moreover, it is not respondent's position that the stockholder class voting requirement, the mandatory dividend provision, and the objectionable action provision completely prevented the Alumax board from managing the business and affairs of Alumax; rather, it is respondent's position that the Alumax board's power to manage any matter that was subject to that requirement and those provisions was restricted.

We found certain of Mr. Balotti's opinions to be qualified in material respects. To illustrate, Mr. Balotti concedes that the Alumax board's power was impaired by the director and stockholder class voting requirements, the mandatory dividend provision, and the objectionable action provision, albeit, in his opinion, not "significantly". By way of further illustration, Mr. Balotti qualifies his opinion relating to the voting power of the class C directors by stating that those directors "generally" had 80 percent of the voting power of the Alumax board and by concluding that in "most" circumstances the class C directors could effectuate their will if they chose to do so. Mr. Balotti thus acknowledges, as he must on the facts presented in this case, that the class C directors could not cast 80 percent of the votes entitled to be cast by the Alumax board on all matters that

were submitted to it and that the power of the Alumax board was "impaired", albeit, in his opinion, such impairment was not "significant".

We also found certain of Mr. Balotti's opinions to be internally inconsistent in material respects and/or to have been reached by disregarding certain material facts to which the parties have stipulated. To illustrate, although Mr. Balotti qualifiedly concludes that the director class voting requirement, the stockholder class voting requirement, the mandatory dividend provision, and the objectionable action provision did not "significantly" impair the power of the Alumax board to manage the business and affairs of Alumax or the exercise of such power, he nonetheless concludes unqualifiedly that the Alumax board managed the business and affairs of Alumax. By way of further illustration, although Mr. Balotti qualifiedly concludes that the class C directors "generally" had 80 percent of the voting power of the Alumax board and refers to the director class voting requirement and the stockholder class voting requirement as "limitations on the exercise of majority power by Amax", he nonetheless concludes unqualifiedly that the class C directors had the right to, and did exercise, 80 percent of the voting power of the Alumax board.

It is also noteworthy that Mr. Balotti's opinions appear to have been based in large part on his view that the limitations on the Alumax board resulting from the director and stockholder

class voting requirements, the mandatory dividend provision, and the objectionable action provision are "similar" to the restrictions that are "commonly" imposed on the boards of directors of other Delaware corporations "having analogous investor profiles" in order to protect the interests of minority stockholders of those corporations. In a number of instances, Mr. Balotti's reports do not disclose sufficient facts and data for us to be satisfied that the boards of other Delaware corporations that do, in fact, have investor profiles analogous to that of Alumax are, in fact, commonly limited by all of the restrictions involved in this case or by restrictions that are, in fact, similar to all of those restrictions.[17]  See Rule 143(f)(1).

---

[17]  Indeed, to the extent that Mr. Balotti's reports do disclose some facts describing what he concludes are restrictions that are "similar" to the director and stockholder class voting requirements involved here, we disagree that such restrictions are similar. By way of illustration, Mr. Balotti states that the director and stockholder class voting requirements with respect to all of the restricted matters presented here are comparable to voting rights that are given to minority stockholders on events such as a merger, an amendment to the certificate of incorporation, a sale of substantially all the assets of a corporation, and a dissolution of a corporation. However, minority stockholders have voting rights on all of the matters mentioned by Mr. Balotti because State law gives them such rights. See 2 Fletcher Cyclopedia of Corporations, secs. 542, 544, 545, 546 (perm. ed. 1990 rev.). None of those matters relates to the management of corporate business and affairs which are entrusted to its board of directors under the applicable State law and on which the vote or approval of the stockholders is not required by that law. In contrast, most of the restricted matters on which the Alumax directors and stockholders, respectively, were required to vote by class were the types of matters relating to the management of the business and affairs of Alumax that were entrusted under

(continued...)

In any event, even assuming arguendo that Mr. Balotti were correct in his view that all of the restrictions involved in this case, or similar restrictions, are common in Delaware corporations with investor profiles analogous to that of Alumax, in the instant case, we nonetheless would determine the impact, if any, of the director and stockholder class voting requirements, the mandatory dividend provision, and the objectionable action provision on the voting power of the Alumax class C common stock for purposes of section 1504(a)(1) and amended section 1504(a)(1)(B) and (2)(A), just as we would consider the impact, if any, of such facts on the voting power of the stock of any

---

[17]  (...continued)
Delaware law to the Alumax board except as provided in the 1984 restated certificate of incorporation and were matters on which under Delaware law and that certificate the Alumax board was to vote and on which the vote or approval of the Alumax stockholders was not required by Delaware law, although it was required by that certificate.  By way of further illustration, Mr. Balotti concludes that the mandatory dividend provision, which he describes as giving the Mitsui group "80 percent of the first 35% of income distributed by dividends", is comparable to provisions that grant superior dividend rights to preferred stockholders. We disagree.  Although the parties agree that the mandatory dividend provision gave the Alumax class B common stock superior dividend rights with respect to 35 percent of Alumax' net income, that provision also required the Alumax board to declare and pay dividends to all the Alumax stockholders to the extent of 35 percent of Alumax' net income.  In contrast, the preferential dividend provisions to which Mr. Balotti compares the mandatory dividend provision usually do not obligate a company's board of directors to declare and pay dividends, see 12 Fletcher Cyclopedia of Corporations, secs. 5443-5446 (perm. ed. 1996 rev.), although once the board decides to declare dividends, preferred stockholders with preferential dividend rights have superior rights to such dividends.

other corporation which presented to us the same issue as is presented here.  That is because neither the pervasiveness of such class voting requirements and such dividend and objection-able action provisions in other corporations with analogous investor profiles to that of Alumax nor the underlying reason for their presence controls whether and/or how those requirements and provisions affect the determination of whether the Alumax class C common stock satisfies the 80-percent voting power test of section 1504(a)(1) and amended section 1504(a)(1)(B) and (2)(A).

We did not find Mr. Balotti's reports to be helpful in resolving the issue presented here under section 1504(a)(1) and amended section 1504(a), and we do not rely on those reports in making our findings and reaching our conclusions herein.  See Fed. R. Evid. 702.

### Mr. Black's Reports

We found certain statements in Mr. Black's reports to be legal opinions that are beyond the proper scope of expert opin-ions.  See Marx & Co. v. Diners' Club Inc., 550 F.2d at 508-512; Laureys v. Commissioner, 92 T.C. at 127-129.  By way of illustra-tion, Mr. Black, whose reports focus primarily on whether the director and stockholder class voting requirements, the mandatory dividend provision, and the objectionable action provision affected the voting power of the Alumax class C common stock for purposes of section 1504(a), concludes that the "consolidation

rules in IRC § 1504 and related regulations were intended to ensure that the enterprises that are eligible for consolidation are operated as a single 'business unit' and that this "purpose was not achieved by Amax and Alumax between 1984 and 1986".  By way of further illustration, Mr. Black concludes that the analysis that he, as a corporate lawyer, applies in reaching his conclusions relating to the "total voting power" of the Alumax class C common stock is the analysis that should be applied in interpreting "total voting power" under section 1504.  He also opines that under section 1504:  (1) Generally, "the holder of 51% of the voting power of a corporation's shares has (almost) 100% control over the corporation's actions, both at the management/board of directors level and at the shareholder level"; (2) where a class of stockholders may elect 75 percent of the members of a company's board of directors, they have "close to 100% effective voting power because those directors completely controlled * * * the decisions * * * [of the] board" and do not have "less than 80% * * * voting power merely because they elected only 75% of * * * [the] board"; and (3) "Amax had 80% voting control, and thus (almost) 100% effective control," over certain actions that were taken by Alumax.

Mr. Black further opines that the Alumax class C common stock possessed slightly more than 50 percent, but less than 80 percent, of the "total voting power" of all classes of Alumax

stock.  The analysis that he used in reaching that conclusion involved the following three steps:  (1) A division into four categories of the range of actions that could be taken by Alumax; (2) a determination of the "relative importance" of each such class of actions; and (3) a determination of the degree of "control" exercised by the Amax group stockholders and the Mitsui/Nippon group stockholders over each such class of actions. Mr. Black does not define or explain in his reports certain key components of that analysis, such as his definition of "control". In fact, he uses the term "control", as well as the terms "total voting power", "voting power", "effective voting power", "effective control", "voting control", and "relative voting power", without giving any of those terms a defined meaning; at times he uses them as though they have the same meaning, and at other times he uses them as though they have different meanings.

Assuming arguendo that Mr. Black's analysis were the proper analysis to be applied in determining whether the Alumax class C common stock satisfied the 80-percent voting power test of section 1504(a)(1) and amended section 1504(a)(1)(B) and (2)(B), we nonetheless would not find that analysis useful in making that determination.  That is because some of the key steps in Mr. Black's analysis require that he make qualitative judgments, but at times he does not explain the bases for those judgments.  See Rule 143(f)(1).  By way of illustration, Mr. Black concludes,

- 69 -

without providing any explanation, (1) that Alumax actions that were subject to the director and stockholder class voting requirements were the "most important" type of actions to be taken by Alumax and (2) that Alumax actions to be taken by the Alumax board that were not subject to those requirements and that could not possibly trigger the rights of Mitsui Japan and/or Mitsui USA under the objectionable action provision were the "least important" type of actions to be taken by Alumax.

Certain of the conclusions that Mr. Black reaches in his reports also are based on internally inconsistent statements. For example, although Mr. Black proposes that "total voting power" be measured by analyzing "the full range of actions to be taken by Alumax and the degree of control Amax and Mitsui had over those actions", he also proposes that "total voting power" be measured based on "the voting power in fact exercised by each class of the shares".

We did not find Mr. Black's reports to be helpful in resolving the issue presented here under section 1504(a)(1) and amended section 1504(a), and we do not rely on them in making our findings and reaching our conclusions herein. See Fed. R. Evid. 702.

The Class Voting Requirements

As a result of the stockholder class voting requirement with respect to the stockholder restricted matters and the director class voting requirement with respect to the director restricted

matters, each of the two classes of Alumax stock (viz, the Alumax class B common stock and the Alumax class C common stock), directly and indirectly through the respective directors whom each class elected (viz, the class B directors and the class C directors, respectively), had 50-percent voting power as to any of those restricted matters. That is because each class had the power to cast 50 percent of the votes entitled to be cast on any such matter. (We shall sometimes refer collectively to the stockholder restricted matters and the director restricted matters as the restricted matters.)

Respondent generally contends that the director and stock-holder class voting requirements as to each of the six restricted matters affected the voting power of the Alumax class C common stock for purposes of section 1504(a)(1). However, in advancing specific arguments in support of that contention, respondent addresses only certain restricted matters that respondent claims, and petitioners do not dispute, were (1) the types of matters relating to the business and affairs of Alumax which under Delaware law were to be managed by or under the direction of the Alumax board except as provided in the 1984 restated certificate of incorporation (Alumax board management matters); (2) matters on which under Delaware law and the 1984 restated certificate of incorporation the Alumax board was required to vote, and under that certificate that vote was required to be a class vote of the

Alumax class B directors and the Alumax class C directors; and (3) matters on which under the 1984 restated certificate of incorporation but not under Delaware law the Alumax stockholders were required to vote, and under that certificate that vote was to be a class vote of the Alumax class B common stock and the Alumax class C stock.  The restricted matters specifically addressed by respondent are:  (1) Mergers of Alumax that would not cause Alumax as the acquiring corporation to increase its outstanding stock by more than 20 percent; (2)(a) Alumax' acquisition of a material asset (i.e., an asset with a net book value of at least 5 percent of Alumax' net worth, viz, at least $36 million) or (b) a capital appropriation by Alumax of $30 million or more (viz, 1.8 percent of its total assets); (3)(a) Alumax' disposition of such a material asset or (b) an asset disposition request of Alumax of $30 million or more, neither of which would constitute a sale, lease, or exchange of "all or substantially all" of its assets; and (4) the election, selection, or dismissal of the Alumax CEO/president.  Since respondent addresses only the foregoing restricted matters, petitioners limit their arguments to those matters in their reply brief.  We also shall address only those restricted matters (restricted matters at issue) in resolving the issue presented under section 1504(a)(1) and amended section 1504(a).  In this connection, we shall restate petitioners' arguments under section 1504(a)(1) about the respec-

tive director and stockholder class votes required on the restricted matters at issue as they were presented on brief by petitioners, even though certain of those arguments address only the director class voting requirement, and not the stockholder class voting requirement. See supra note 13.

Petitioners contend that the 50-percent voting power of the class B directors and, consequently, of the Alumax class B common stock on the restricted matters at issue did not reduce the voting power of the Alumax class C common stock for purposes of section 1504(a)(1) "any more than the power of preferred stock in Erie Lighting [Co. v. Commissioner, 93 F.2d 883] to vote on a much larger group of matters transformed that preferred [stock] into voting stock." We disagree.

We find significant distinctions between the restricted matters at issue and the matters on which the preferred stockholders in Erie Lighting Co. v. Commissioner, supra, had the right to vote. In Erie Lighting Co., the preferred stockholders had the right to vote on certain matters (e.g., increases or reductions of capital stock of ELC, increases in its capital indebtedness, the number of directors serving on ELC's board of directors, the place of its principal office, and the time of its stockholder meetings) that the court found were "matters usually

reserved to the stockholders",[18] as distinguished from the man-
agement matters that the court found were entrusted to the board
of directors of ELC.  Erie Lighting Co. v. Commissioner, supra at
885.  In deciding whether the preferred stock in Erie Lighting
Co. was voting stock or nonvoting stock for purposes of the
consolidation provisions involved there, the court found that
distinction to be significant.  The court stated that:

> matters usually reserved to the stockholders * * * [on
> which the preferred stockholders had the right to vote]
> are not a basis for holding that two corporations do
> business as a single unit, or that the preferred stock-
> holders control the management of the business enter-
> prise.  That is left [in the Erie Lighting Co. case] to
> the board of directors.  [Id.]

In contrast to the matters "usually reserved to the stockholders"
on which the preferred stockholders had the right to vote in Erie
Lighting Co. v. Commissioner, supra, in the instant case, respon-
dent contends, and petitioners do not dispute, that the re-
stricted matters at issue on which the Alumax board and the
Alumax stockholders, respectively, were required to vote by class
were Alumax board management matters on which under Delaware law
the Alumax board was required to vote, but on which the vote or
approval of the Alumax stockholders was not required under
Delaware law, although it was required by the 1984 restated
certificate of incorporation.

Petitioners also contend that the director and stockholder

---

[18]  See supra note 16.

class voting requirements should be ignored in determining whether the Alumax class C common stock satisfies the 80-percent voting power test of section 1504(a)(1) because those requirements applied only to a limited number of "extraordinary" or "highly unusual" matters, and not to the "vast majority" of "ordinary", "routine", or "day-to-day" matters on which the Alumax board could, and did, vote during the period at issue.[19] According to petitioners, because the restricted matters at issue involved extraordinary or highly unusual situations, the respective class votes required by the Alumax board and the Alumax stockholders on those restricted matters did not "meaningfully impair the power of the [Alumax] Board, operating through the Class C Directors, to manage the business and affairs of Petitioner [Alumax]" and, therefore, did not "in any meaningful way" or "significantly affect the voting power" of the Alumax class C common stock. Accordingly, petitioners conclude, the required director and stockholder class voting should be ignored in

---

[19] To support their position that most of the restricted matters at issue were extraordinary or highly unusual, petitioners point to how infrequently during the period at issue the Alumax board voted on any of those matters compared to how often during that period that board voted on matters that did not require a class vote. They also point to the significant dollar amounts involved in most of the restricted matters at issue (e.g., an acquisition or a disposition of an asset with a book value of at least $36 million and a capital appropriation or an asset disposition request of $30 million or more) as compared to the much smaller dollar amounts involved in the matters on which the Alumax board voted during the period at issue that did not require such a class vote.

deciding the issue presented under section 1504(a)(1).[20]

Initially, we note that, to the extent that it is petitioners' position that it is the actual exercise of voting power which controls the question presented to us under section 1504(a)(1) and amended section 1504(a)(1)(B) and (2)(A), we disagree.  It is the legal right to exercise voting power that is determinative under those provisions.  See Atlantic City Elec. Co. v. Commissioner, 288 U.S. 152, 153-154 (1933); Handy & Harman v. Burnet, 284 U.S. 136, 141 (1931); Rudolph Wurlitzer Co. v. Commissioner, 81 F.2d at 974.

Furthermore, even if the restricted matters at issue on which the Alumax board and the Alumax stockholders had the power to vote by class were, as petitioners claim, extraordinary or highly unusual, those matters, like the ordinary or day-to-day

---

[20]  The reasons advanced by petitioners (as well as their expert) for ignoring the director and stockholder class voting required on the restricted matters at issue (and for ignoring the mandatory dividend provision and the objectionable action provision discussed below) in resolving the question presented under sec. 1504(a)(1) and amended sec. 1504(a) are based on certain qualitative and/or quantitative judgments that they (as well as their expert) have made about those matters.  In making those judgments, petitioners have done precisely what they argue "all judicial and administrative authorities" preclude us from doing in deciding that issue.  Petitioners seek to impose their judgments on this Court and criticize respondent for asking this Court to make its own judgments about the impact of the director and stockholder class voting requirements (as well as the mandatory dividend provision and the objectionable action provision) on the resolution of the issue before us under sec. 1504(a)(1). We, of course, are not bound by petitioners', or respondent's, judgments.

business matters on which the Alumax board had the power to vote in the aggregate, and not by class, were nonetheless Alumax board management matters on which under Delaware law the Alumax board was to vote, but on which the vote or approval of the Alumax stockholders, although required by the 1984 restated certificate of incorporation, was not required under Delaware law.

With respect to petitioners' claim that most of the restricted matters at issue were unusual in that they involved significant dollar amounts, we agree.  However, that fact does not aid petitioners' position under section 1504(a); it only serves to emphasize that those matters, as well as the election, selection, or dismissal of the Alumax CEO/president, were significant, important Alumax board management matters on which the Alumax board and the Alumax stockholders, respectively, had the right to vote by class.[21]

---

[21] It is also significant that during the period Jan. 1 through Mar. 8, 1984, which was prior to the date (viz, Mar. 9, 1984) on which Alumax filed the 1984 restated certificate of incorporation with Delaware but after the date (viz, Jan. 1, 1984) on which that certificate, once filed, was to be effective, the 1974 restated certificate of incorporation required that any action by the Alumax board be by an affirmative class vote of the voting members of that board who were elected by the class A common stock and the voting members of that board who were elected by the class B common stock, who were present and voting.  In addition, during that same period, any action of the Alumax stockholders required an affirmative class vote of a majority of the outstanding shares of each of the two classes of Alumax common stock.  Not only were the Alumax board and the Alumax stockholders required to vote, respectively, by class during the period in 1984 preceding Mar. 9, 1984, the date on which Alumax

(continued...)

Petitioners advance additional arguments with respect to certain of the restricted matters at issue in order to support their position that the respective class votes required by the Alumax board and the Alumax stockholders on those matters did not "significantly affect the voting power" of the Alumax class C common stock and, therefore, should be ignored in resolving the issue presented under section 1504(a)(1). With respect to the restricted matter at issue relating to a merger of Alumax that would not cause Alumax as the acquiring corporation to increase its outstanding stock by more than 20 percent, petitioners claim that various rulings (e.g., I.T. 3896, 1948-1 C.B. 72; Priv. Ltr. Rul. 90-26-047 (Mar. 30, 1990); Priv. Ltr. Rul. 87-53-005 (Sept. 30, 1987); Priv. Ltr. Rul. 83-49-048 (Sept. 2, 1983)) "regard class voting rights on mergers of any size as having no effect whatsoever on whether stock is 'voting stock' or on the measurement of the 'voting power' of voting stock." We disagree. As we read those rulings, none of them involved a class vote by the

---

[21] (...continued)
filed the 1984 restated certificate of incorporation with Delaware, that board and those stockholders did in fact vote by class on various matters during that period, including (1) the election of new officers; (2) three capital appropriations of Alumax in amounts not exceeding $2,413,000, $15,864,000, and $250,686,000, respectively; (3) Alumax' 5-year forecast for the period 1984 through 1988; (4) Alumax' capital expenditure plan for that 5-year period; (5) Alumax' 1984 profit plan; (6) Alumax' 1984 capital expenditure proposal; (7) the declaration of dividends; and (8) two matters relating to Alumax' employee compensation plans.

stockholders therein with respect to the mergers in question. Moreover, as we construe the rulings on which petitioners rely, the stockholder vote involved in those rulings applied only to certain, rather than all, types of mergers. None of those rulings indicated that the stockholder vote involved therein applied to mergers, such as those that are part of the restricted matters at issue here, which were entrusted to the board of directors under the applicable State law and on which a stockholder vote was not required under such law. In any event, none of the rulings cited by petitioners considered the impact on the voting power of stock for purposes of section 1504(a)(1) or amended section 1504(a)(1)(B) and (2)(A) of a requirement imposed by the certificate of incorporation for a director class vote, as well as a stockholder class vote, on a merger on which under the applicable State law the board of directors was required to vote but not the stockholders.

With respect to the restricted matter at issue relating to the election, selection, or dismissal of the Alumax CEO/president, petitioners contend that the "CEO had limited powers; notably, he could affect only those transactions that were both within the business plan (which the Class C Directors could establish) and not in excess of $1.5 million". Petitioners appear to be arguing that, because limitations were placed on the CEO/president's ability to approve certain expenditures, that

officer did not have a significant role in the management of the business and affairs of Alumax and that therefore the power of the Alumax stockholders and the Alumax directors to vote by class with respect to his or her election, selection, or dismissal is not significant to the resolution of the issue presented under section 1504(a)(1).[22]  We disagree.  Petitioners fail to acknowledge that the 1984 bylaws required the CEO/president to "have general charge and supervision of the business of the corporation" and "perform all duties incident to the office of president of a corporation, and such other duties as, from time to time, may be assigned to him by the Board of Directors or as may be provided by law."  Accordingly, despite any limitation on the powers of the Alumax CEO/president to approve an expenditure in excess of a stated amount, that officer nonetheless had broad discretion over, and a significant role in, the management of the business and affairs of Alumax.

On the record before us, we find that the director and stockholder class voting requirements with respect to the restricted matters at issue impact the voting power of the Alumax class C common stock for 1984 for purposes of section 1504(a)(1)

---

[22]  Petitioners' argument regarding the director and stockholder class voting required as to the election, selection, or dismissal of the Alumax CEO/president appears to us to be inconsistent with their argument regarding the other restricted matters at issue that they claim are unusual or extraordinary.  See discussion supra.

and for 1985 and 1986 for purposes of amended section 1504(a)(1)(B) and (2)(A). See generally Anderson-Clayton Securities Corp. v. Commissioner, 35 B.T.A. 795 (1937).

The Mandatory Dividend Provision

Respondent contends that the mandatory dividend provision, which was contained in the 1984 restated certificate of incorporation, affected the voting power of the Alumax class C common stock for purposes of section 1504(a)(1). In support of that contention, respondent asserts, and petitioners do not dispute, that the determination of whether or not to declare and pay dividends was one of the Alumax board management matters on which the Alumax board would have had the power to vote if it had not been for the mandatory dividend provision, which removed from that board the power to determine whether or not to declare and pay dividends to the extent of 35 percent of Alumax' net income.[23]

Petitioners contend that the mandatory dividend provision did not reduce the voting power of the Alumax class C common stock or detract from the power of the class C directors to manage the business and affairs of Alumax or from the exercise of

---

[23] The mandatory dividend provision required that dividends to the extent of 35 percent of Alumax' net income be declared by the Alumax board and paid by Alumax "to the extent permitted by law." The parties do not suggest that such dividends were not mandatory because they were to be declared and paid "to the extent permitted by law."

that power.  Consequently, according to petitioners, that provision did not reduce the voting power of the Alumax class C common stock for purposes of section 1504(a)(1) below the 80 percent which petitioners claim that stock possessed.  In support of their position regarding the mandatory dividend provision, petitioners advance arguments which are based on the premises that the restrictions placed on the power of the Alumax board as a result of that provision are similar to the restrictions placed on the power of other boards of directors as a result of (1) "fixed payment" provisions contained in "debt instruments" requiring the payment of principal and/or interest and (2) "preferential dividend" provisions contained in "preferred stock * * * instruments".  We disagree with the premises on which petitioners' position regarding the mandatory dividend provision is based.  We therefore reject their position.

The power to incur debt and to enter into debt instruments that fix the terms for the repayment of principal and any payment of interest are powers relating to the management of the business and affairs of a company that are entrusted to its board of directors and that the board may delegate to others like corporate officers.[24]  See 2 Fletcher Cyclopedia of Corporations, sec.

---

[24]  In the case of certain debt (e.g., "bonded indebtedness"), a stockholder vote or approval is required under certain State laws.  See 5 Fletcher Cyclopedia of Corporations, sec. 2105 (perm. ed. 1996 rev.).

473 (perm. ed. 1990 rev.).  Once a company's board of directors (or its delegates) has exercised its power to incur debt, any fixed payments of principal and interest on that debt that are set forth in the debt instrument are not matters relating to that board's management of the company's business and affairs.  They are matters relating to the contractual obligation that was imposed on the company when its board of directors (or delegates) decided to exercise its power to incur the debt.  Unlike the mandatory dividend provision which obligated the Alumax board to declare and pay dividends to its stockholders to the extent of 35 percent of its net income and therefore restricted that board's power to act with respect to one of the Alumax board management matters, fixed-payment provisions in debt instruments do not restrict the powers of a company's board of directors with respect to management matters entrusted to it.  We find that the fixed-payment provisions in debt instruments to which petitioners refer are materially different from the mandatory dividend provision involved here.

As examples of preferential dividend provisions in preferred stock certificates that petitioners claim are similar to the mandatory dividend provision, they point to preferential dividend provisions described in various cases and rulings (e.g., Rudolph Wurlitzer Co. v. Commissioner, 81 F.2d 971 (6th Cir. 1936); Rev. Rul. 71-83, 1971-1 C.B. 268; Priv. Ltr. Rul. 79-38-060 (June 21,

- 83 -

1979)) and in certain documents that are part of the instant record under which certain Delaware corporations gave their preferred stockholders preferential dividend rights.  None of the preferential dividend provisions described in the cases and rulings and in the documents that are part of the instant record to which petitioners refer restricted the power of a company's board of directors to determine whether to declare and pay dividends by requiring it to do so.  Instead, those provisions merely indicated that, once a board exercised its power to declare and pay dividends, it was required to pay a certain amount of dividends with respect to one class of stock before it could pay any dividends with respect to another class of stock. See 12 Fletcher Cyclopedia of Corporations, secs. 5443-5446 (perm. ed. 1996 rev.).  In contrast, the mandatory dividend provision restricted the power of the Alumax board to determine whether or not to declare and pay dividends to the extent of 35 percent of Alumax' net income by requiring it to declare and pay dividends to that extent to both classes of the Alumax stock.[25] We find that the preferential dividend provisions in the pre- ferred stock certificates to which petitioners refer are materi- ally different from the mandatory dividend provision.

---

[25]  The parties agree that the mandatory dividend provision also gave the Alumax class B common stock a preferential right to receive 80 percent of the dividends that the Alumax board was required to declare and pay to all Alumax stockholders.

Petitioners also contend that the preferential dividend rights of the preferred stockholders in Erie Lighting Co. v. Commissioner, 93 F.2d 883 (1st Cir. 1937), are similar to the mandatory dividend provision involved here. We disagree. The preferential dividend provision in Erie Lighting Co. stated:

> "The holders of preference shares shall be entitled to receive out of the surplus or net profits of the said corporation, and the said corporation shall be bound to pay, quarterly cumulative dividends at the rate of $2.00 per share per annum, which quarterly dividends shall be paid, or set aside for payment, for each quarter before any dividend shall be declared or paid upon any other stock of said corporation; * * * After all accumulated and accrued dividends on the preference shares have been declared and paid, or set aside for payment, dividends may be declared and paid out of the remaining surplus or net profits to holders of common shares at the rate of $2.00 per share per annum, and all additional distribution of surplus or net profits as dividends shall be made at the same rate per share to holders of stock of both classes. * * *
>
> The holders of said preference shares shall have no power to vote the same at any election for directors unless the dividends on the said preference shares for two quarterly periods, whether consecutive or not, shall remain unpaid." [Id. at 884.]

We do not construe the preferential dividend provision involved in Erie Lighting Co. v. Commissioner, supra, as limiting the discretion of ELC's board of directors by requiring it to declare and pay dividends to the extent of a specified amount of ELC's net income with respect to its two classes of outstanding stock (viz, ELC preferred stock and ELC common stock). Rather, pursuant to the preferential dividend provision involved in Erie Lighting Co., once the ELC board of directors exercised its power

to declare and pay dividends, it had to pay prescribed amounts of dividends with respect to the ELC preferred stock, which amounts were cumulative, before it could pay any dividends with respect to the ELC common stock. We find that the preferential dividend provision involved in Erie Lighting Co. v. Commissioner, supra, was not mandatory,[26] see 12 Fletcher Cyclopedia of Corporations, sec. 5445 (perm. ed. 1986), and that it is materially different from the mandatory dividend provision involved in the present case. In so finding, we have not only relied on and construed the language of the preferential dividend provision as set forth by the court in Erie Lighting Co. v. Commissioner, supra, we also have been mindful that that court found that under the applicable State law and ELC's bylaws the management of the business and affairs of ELC, and thus, inter alia, the power to determine whether or not to declare and pay dividends, were entrusted to its board of directors. Petitioners, however, appear to dispute that finding of the court in Erie Lighting Co. They contend that

---

[26] Even assuming arguendo that the dividend provision in Erie Lighting Co. v. Commissioner, 93 F.2d 883 (1st Cir. 1937), had required the ELC board to declare and pay dividends, the parties in that case did not advance any arguments with respect to the impact of any such mandatory dividend provision on the classifi- cation of the preferred stock involved there as voting or nonvot- ing stock for purposes of the applicable consolidation provi- sions. Consequently, the court in Erie Lighting Co. did not have occasion to, and did not, address the effect of a preferred stock mandatory dividend provision on whether such stock was voting or nonvoting stock and did not reach its holding on the basis of any such alleged mandatory provision.

the power of ELC's board of directors in <u>Erie Lighting Co. v.</u>
<u>Commissioner</u>, <u>supra</u>, was restricted not only because of the
preferential dividend provision involved there, but also because
the ELC

> board * * * was prohibited from affecting any "invest-
> ment of surplus" or "increase of capital indebtedness"
> without the approval of the preferred stockholders. * *
> *
>
>      *     *     *     *     *     *     *
>
> * * * the <u>Erie Lighting</u> board was more restricted than
> Petitioner's Board because the <u>Erie</u> preferred stock-
> holders could vote on any borrowings or reinvestment of
> undistributed earnings.

We disagree with petitioners' contentions.

Initially, we note that, contrary to petitioners' assertion,
the court in <u>Erie Lighting Co. v. Commissioner</u>, <u>supra</u>, did not
state that the preferred stock in question had a right to vote on
or approve "investment of surplus" or "any borrowings".  Indeed,
that court did not even use the phrase "investment of surplus",
or any similar phrase, in its opinion.[27]  While the court in <u>Erie</u>

---

[27] The Board of Tax Appeals in <u>Erie Lighting Co. v. Commis-</u>
<u>sioner</u>, 35 B.T.A. 906, 910-911, revd. 93 F.2d 883 (1st Cir.
1937), found that the preferred stock in question "could by its
vote affect and effect action in various ways, such as in regard
to * * * approval of investment of surplus".  However, in revers-
ing the decision of the Board of Tax Appeals in that case, the
Court of Appeals in <u>Erie Lighting Co. v. Commissioner</u>, <u>supra</u>, did
not indicate in its opinion that the preferred stock in question
had a right to vote on or to approve the "investment of surplus".
Even assuming arguendo that the ELC preferred stock had a right
to vote on or to approve the "investment of surplus", the Court
of Appeals in the <u>Erie Lighting Co.</u> case did not address the
(continued...)

Lighting Co. v. Commissioner, supra, did find that the preferred stock involved there had the right to vote on many matters, including "any increase of the capital indebtedness", that matter is not one of the matters involved in the present case. More-over, unlike the Alumax board management matters over which the parties disagree regarding their impact for purposes of section 1504(a)(1) and which did not require a stockholder vote or approval under Delaware law, an increase in the capital indebted-ness of ELC was, according to the court in Erie Lighting Co., one of the matters that are "usually reserved to the stockholders". Erie Lighting Co. v. Commissioner, 93 F.2d at 885. The court in Erie Lighting Co. did not consider any of those stockholder matters to be a restriction on the power of the ELC board. To the contrary, that court found that under the applicable State law and ELC's bylaws the board of directors of ELC was entrusted with the management of its business and affairs, and it did not mention any management matter that it believed was taken away from that board by those stockholder matters. Id.

On the record before us, we find that the mandatory dividend provision impacts the voting power of the Alumax class C common stock for 1984 for purposes of section 1504(a)(1) and for 1985

[27] (...continued)
effect of any such right on whether the ELC preferred stock was voting or nonvoting stock and did not reach its holding on the basis of any such right.

and 1986 for purposes of amended section 1504(a)(1)(B) and (2)(A).

The Objectionable Action Provision

Respondent contends that the objectionable action provision affected the voting power of the Alumax class C common stock for purposes of section 1504(a)(1). In support of that contention, respondent focuses on the objectionable action provision only insofar as it applied to actions taken by the Alumax board (director objectionable action provision), and not insofar as it applied to actions taken by the Alumax stockholders. We also shall address only the director objectionable action provision.

Respondent contends that the director objectionable action provision prevented the Alumax board from taking any action that could have had a material and adverse impact on the value of the Alumax class B common stock which was held by the Mitsui group, even though such action may have been in the best interests of Alumax and/or Amax. According to respondent, that provision gave the Mitsui group "virtual veto power" over any important action that Alumax took.

Petitioners contend that the director objectionable action provision did not detract from the power of the class C directors to manage the business and affairs of Alumax or from the exercise of that power and thus did not reduce the voting power of the Alumax class C common stock for purposes of section 1504(a)(1)

below the 80 percent which petitioners claim that stock pos-
sessed.  According to petitioners, the director objectionable
action provision gave the Mitsui group a contingent right to
acquire additional voting power over future actions of Alumax,
which is comparable to the contingent rights held by the holders
of the preferred stock in Erie Lighting Co. v. Commissioner,
supra, and by the holders of convertible or exchangeable stock
and unexercised options or warrants.  In this connection, peti-
tioners assert:

> During the period at issue the law was clear that
> "voting power" was determined on the basis of actual
> voting power at the time of measurement, and that any
> possibility that voting power might change as a result
> of an event, such as the conversion of non-voting stock
> into voting stock or a purchase or redemption of stock,
> even if scheduled to occur, was irrelevant. * * *

To support their position with respect to the director objection-
able action provision, petitioners rely on, inter alia, the
following cases and rulings involving certain questions raised
under the consolidation provisions:

(1) Atlantic City Elec. Co. v. Commissioner, 288 U.S. 152
(1933), which held that preferred stock with certain voting
rights was voting stock even though it was redeemable by the
issuer at any time because the holders of that stock had voting
rights with respect to the "direction of * * * [the corporate]
undertaking", id. at 156, and their voting rights remained
unimpaired until actual redemption of that stock;

(2) <u>Erie Lighting Co. v. Commissioner</u>, 93 F.2d 883 (1st Cir. 1937), which held that preferred stock was not voting stock even though it was entitled to certain voting rights upon the occurrence of certain events because those events had not occurred during the years involved there;

(3) <u>Vermont Hydro-Electric Corp. v. Commissioner</u>, 29 B.T.A. 1006 (1934), which held that preferred stock was not voting stock even though it was entitled to certain voting rights upon the occurrence of certain events that had not occurred during the years involved there because (a) stock is not voting stock based on the mere possibility that sometime in the future it might be entitled to vote, and (b) it is the situation actually existing during the period in controversy that is determinative, not a situation that might have existed upon the happening of a contingency; and

(4) Rev. Rul. 64-251, 1964-2 C.B. 338, which held that unexercised warrants to purchase stock in a corporation do not constitute "stock ownership" within the meaning of section 1504(a) of the Internal Revenue Code of 1954 (1954 Code) because they do not confer upon the holder any rights or liabilities as a stockholder of that corporation prior to their being exercised.

We reject petitioners' position regarding the director objectionable action provision. We find significant distinctions between the rights held by the Mitsui group under the director

objectionable action provision and the rights held by the holders

of the stock, options, and warrants involved in the cases and

rulings on which petitioners rely.  Contrary to petitioners'

claim, the director objectionable action provision did not give

the Mitsui group merely a contingent right to acquire additional

voting power over future actions of Alumax.  That provision gave

the Mitsui group the legally enforceable right during the period

at issue to (1) negate the exercise of the power of the Alumax

board on any director nonrestricted matter,[28] which the Mitsui

group believed could materially and adversely affect the value of

its investment in Alumax and to which one of the class B direc-

tors whom it elected objected and (2) permit a panel of arbitra-

tors to decide whether or not that board's exercise of its power

on any such matter was to become effective.[29]  Consequently,the

---

[28]  We have found that the director objectionable action provi-
sion applied only to director nonrestricted matters on which the
directors voted in the aggregate, and not by class.  That is
because any board action that required a class vote of the Alumax
directors required, inter alia, an affirmative vote of the
majority of the class B directors.  Since there were only two
class B directors, any such board action required the approval of
both of those directors and could not be taken over the objection
of either one of those directors.

[29]  Petitioners contend that the class C directors were not
likely to take any action that would trigger the rights of the
Alumax class B common stock under the director objectionable
action provision and that the Mitsui group was not likely to
exercise its rights under that provision.  As we view it, the
essence of petitioners' contention is that the director objec-
tionable action provision is, in effect, a meaningless provision.
We disagree.  Moreover, petitioners concede on brief that that
(continued...)

Alumax board, and thus the class C directors of that board, did not have any effective power to take action on any such director nonrestricted matter.

On the record before us, we find that the director objectionable action provision impacts the voting power of the Alumax class C common stock for 1984 for purposes of section 1504(a)(1) and for 1985 and 1986 for purposes of amended section 1504(a)(1)(B) and (2)(A).

Conclusion

Based on our review of the entire record before us, we find that the respective director and stockholder class voting requirements with respect to the restricted matters at issue, the mandatory dividend provision, and the director objectionable action provision reduced the voting power of the Alumax class C common stock for 1984 for purposes of section 1504(a)(1) and for 1985 and 1986 for purposes of amended section 1504(a)(1)(B) and (2)(A) below the 80 percent which petitioners claim that stock possessed. We further find that petitioners have failed to establish that the 80-percent value test of amended section

(...continued)
provision gave the Mitsui group "the ability to protect the value of its investment in face of an extreme event." In addition, the record does not contain any evidence to suggest that the Mitsui group would not have exercised its rights under the director objectionable action provision to protect its investment in Alumax if and when, in its discretion, it became necessary to do so.

1504(a)(1)(B) and (2)(B) was satisfied for 1985 and 1986.

Consequently, we hold that for 1984 and for 1985 and 1986 petitioners were not members of the affiliated group within the meaning of section 1504(a) and amended section 1504(a), respectively, that had Amax as its common parent.[30]  Accordingly, we sustain respondent's determination that petitioners are not entitled to join in the consolidated return that Amax filed for each of those years in which it claimed to be the common parent of a group of corporations that included petitioners.[31]

Period of Limitations

Petitioners argue that even if the Court were to find that petitioners are not entitled to join in the consolidated return that Amax filed for each of the years 1984, 1985, and 1986, the respective periods of limitations for those years for assessing tax due from petitioners' group have expired.  Respondent argues that section 1.1502-77(c)(2), Income Tax Regs., rejects petitioners' contention.  That regulation provides:

> (c)  Effect of waiver given by common parent.

---

[30]  We note that the issue presented here under sec. 1504(a) and amended sec. 1504(a) turns on the particular facts established by the record in this case, and nothing in this Opinion is intended to be, or should be read as, deciding or implying any finding or conclusion of this Court under that section in other cases involving facts that may appear to be similar to those presented in the present case.

[31]  In reaching our holding, we have considered all of petitioners' arguments that are not discussed herein and found them to be without merit.

Unless the district director agrees to the contrary, an agreement entered into by the common parent extending the time within which an assessment may be made or levy or proceeding in court begun in respect of the tax for a consolidated return year shall be applicable--

        *    *    *    *    *    *    *

(2)  To each corporation the income of which was included in the consolidated return for such taxable year, notwithstanding that the tax liability of any such corporation is subsequently computed on the basis of a separate return under the provisions of §1.1502-75.

Petitioners counter that section 1.1502-77(c)(2), Income Tax Regs., "is an invalid exercise of the Secretary's rule-making authority."[32]  According to petitioners,

Nothing in section 1502 authorizes the Secretary to

---

[32]  In support of their contention that sec. 1.1502-77(c)(2), Income Tax Regs., is invalid, petitioners rely on J.A. Folger & Co. v. Commissioner, 27 B.T.A. 1 (1932), which involved a year that preceded the year (viz, 1929) in which art. 17(a)(2) of Regulations 75, the original predecessor of sec. 1.1502-77(c)(2), Income Tax Regs., first became effective.  In J.A. Folger & Co., a parent corporation (parent corporation) filed consolidated returns for certain years for itself and two of its subsidiary corporations (subsidiary corporations).  J.A. Folger & Co. v. Commissioner, supra at 3.  The parent corporation entered into an agreement with the IRS extending the period of limitations for the "assessment of income and war profits tax due under any return made on behalf of that taxpayer" for one of those years.  Id.  (Emphasis added.)  That agreement made no mention of the subsidiary corporations.  Id. at 7-8.  Under those facts, the Board of Tax Appeals held in J.A. Folger & Co. v. Commissioner, supra at 7-8, that the agreement that the parent corporation entered into with the IRS did not extend the period of limitations for the assessment of tax against the subsidiary corporations.  J.A. Folger & Co. is factually distinguishable from the instant case.  The Forms 872 executed by Amax and Cyprus Amax, respectively, identified the "taxpayer(s)" as "Amax Inc. and Consolidated Subsidiaries" or "Amax Inc. and Consolidated Subs", and not just Amax.

promulgate regulations that create agency relationships between corporations that never were part of the affiliated group, yet this is precisely what the Secretary purports to have done in Treas. Reg. section 1.1502-77(c)(2). The regulation thus is inconsistent with the "plain language of the statute" and cannot be valid.

Section 1.1502-77(c)(2), Income Tax Regs., is a legislative regulation that was promulgated under section 1502[33] and that appears in the portion of the regulations under that section entitled "Administrative Provisions and Other Rules". As a legislative regulation, section 1.1502-77(c)(2), Income Tax Regs., must be upheld unless it is arbitrary, capricious, or manifestly contrary to section 1502. <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council Inc.</u>, 467 U.S. 837, 844 (1984).

Regulations substantially the same as section 1.1502-77(c)(2), Income Tax Regs., were first issued as article 17(a)(2) of Regulations 75[34] under the authority of section 141(b) of the

---

[33] Section 1502 provides:

The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

[34] Art. 17(a)(2) of Regulations 75 provided:

(a) <u>Effect of Waiver given by Parent</u>.

Any consent given by the parent corporation * * * extending the time within which an assessment may be made

(continued...)

Revenue Act of 1928 (1928 Act), ch. 852, 45 Stat. 831,[35] a provision that was substantially the same as section 1502.  When Congress was considering a revision of the revenue law that ultimately became the 1928 Act it became aware of a broad range of problems and potential abuses that had emerged in the administration and interpretation of the consolidated return provisions. Many of those problems and potential abuses were set forth in the Staff of Joint Committee, Report of the Joint Committee on Internal Revenue Taxation (Vol. I), 63-66 (1928) (Joint Committee report).  The Joint Committee report recommended that the consolidated return provisions be abolished and replaced with provisions permitting the operating loss of any member of an affiliated group, as defined in the Joint Committee report proposal, to be offset against the net income of one or more members of that

[34]  (...continued)
or distraint or proceeding in court begun, in respect of the tax for a consolidated return period, shall be applicable * * * (2) to each corporation the income of which was included in the consolidated return, or which filed Form 1122, for such period, even though it is subsequently determined that such corporation was not a member of the group.

[35]  Sec. 141(b) of the Revenue Act of 1928 (1928 Act), ch. 852, 45 Stat. 831, provided:

    Regulations.--The Commissioner, with the approval of the Secretary, shall prescribe such regulations as he may deem necessary in order that the tax liability of an affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be determined, computed, assessed, collected, and adjusted in such manner as clearly to reflect the income and to prevent avoidance of tax liability.

group.  Joint Committee report, <u>supra</u> at 66.  After considering

the Joint Committee report, the House of Representatives (House)

in its bill that Congress considered in connection with passage

of the 1928 Act decided to deny the privilege of filing consoli-

dated returns after taxable year 1928, thereby compelling all

corporations to file separate returns.  See H.R. 1, 70th Cong.,

1st Sess. sec. 141 (1927); see also H. Rept. 2, 70th Cong. 1st

Sess. (1927), 1939-1 C.B. (Part 2) 384, 397.

The Senate Finance Committee was not convinced that elimina-

tion of the privilege of filing consolidated returns was an

appropriate solution to the wide range of problems and potential

abuses to which the Joint Committee report alluded that had

emerged in the administration and interpretation of the consoli-

dated return provisions.  Instead, the Senate Finance Committee

recommended retention of the consolidated return provisions but

coupled such retention with provisions authorizing the Commis-

sioner, with the approval of the Secretary of the Treasury

(Secretary), to promulgate special regulations that would deal

with the types of problems and potential abuses raised by the

Joint Committee report.  The Senate Finance Committee stated in

pertinent part:

>     Many difficult and complicated problems * * * have
> arisen in the administration of the provisions permit-
> ting the filing of consolidated returns.  It is, obvi-
> ously, of utmost importance that these questions be
> answered with certainty and a definite rule be pre-
> scribed.  Frequently, the particular policy is compara-
> tively immaterial, so long as the rule to be applied is
> known.  The committee believes it to be impracticable

to attempt by legislation to prescribe the various
detailed and complicated rules necessary to meet the
many differing and complicated situations.  Accord-
ingly, it has found it necessary to delegate power to
the Commissioner to prescribe regulations legislative
in character covering them. * * * Furthermore, the
section requires that all the corporations joining in
the filing of a consolidated return must consent to the
regulations prescribed prior to the date on which the
return is filed.

Among the regulations which it is expected that
the Commissioner will prescribe are: * * * (5) that the
corporations filing the consolidated return must desig-
nate one of their members as the agent for the group,
in order that all notices may be mailed to the agent,
deficiencies collected, refunds made, interest com-
puted, and proceedings before the Board of Tax Appeals
conducted as though the agent were the taxpayer.  [S.
Rept. 960, 70th Cong., 1st Sess. (1928), 1939-1 C.B.
(Part 2) 409, 419.]

Congress ultimately accepted the Senate Finance Committee's

recommendations and enacted section 141(b) of the 1928 Act.  The

Secretary responded to the enactment of section 141(b) of the

1928 Act and promulgated, inter alia, article 17(a) of Regula-

tions 75.  That regulation, like its successor section 1.1502-

77(c), Income Tax Regs., designates the common parent of a group

of corporations that files a consolidated return as the agent for

those corporations in extending the period of limitations for the

assessment of tax against any of those corporations, regardless

whether any of them is required to file a separate return.

In connection with the enactment of the 1954 Code, the House

proposed incorporating into law the then extant regulations under

the consolidated return provisions.[36]  See H. Rept. 1337, 83d Cong., 2d Sess. 87 (1954).  That proposal was rejected by the Senate, S. Rept. 1622, 83d Cong., 2d Sess. 120 (1954), and by the conference committee, H. Conf. Rept. 2543, 83d Cong., 2d Sess. 73 (1954), not because of any concern about the validity of those regulations but because it was believed that it would inhibit the flexibility of the Secretary to supplement and/or modify those regulations as was deemed necessary.  Subsequently, Congress enacted section 1502 as part of the 1954 Code and continued to grant in section 1502 specific legislative authority to the Secretary to promulgate regulations as the Secretary may deem necessary to deal with the difficult and complicated problems relating to the administration of the consolidated return provisions.[37]

---

[36]  After the Revenue Act of 1932 (1932 Act), ch. 209, 47 Stat. 169, and prior to the enactment of the 1954 Code, regulatory provisions substantially similar to art. 17(a)(2) of Regs. 75 appeared subsequently in art. 17(a)(2) of Regs. 78 under the 1932 Act; art. 17(a)(2) of Regs. 89 under the Revenue Act of 1934, ch. 277, 48 Stat. 680; art. 17(a)(2) of Regs. 97 under the Revenue Act of 1936, ch. 690, 49 Stat. 1648; art. 17(a)(2) of Regs. 102 under the Revenue Act of 1938, ch. 289, 52 Stat. 447; sec. 23.17(a)(2) of Regs. 104 under the Code of 1939 (1939 Code); sec. 33.17(a)(2) of Regs. 110 under the Second Revenue Act of 1940, ch. 757, 54 Stat. 974, relating to the excess profits tax; and sec. 24.17(a)(2) of Regs. 129 under the 1939 Code in respect of years after 1949 and before 1954.

[37]  After the enactment of the 1954 Code, regulations substantially similar to art. 17(a)(2) of Regs. 75 and its successor regulatory provisions were promulgated as sec. 1.1502-17(a)(2), Income Tax Regs., under the 1954 Code in respect of years before 1966; sec. 1.1502-77(c)(2), Income Tax Regs., under the 1954 Code in respect of years after 1965; and sec. 1.1502-77(c)(2), Income
(continued...)

Based on our examination of section 1502, its legislative history, and section 1.1502-77(c)(2), Income Tax Regs., we find that section 1.1502-77(c)(2), Income Tax Regs., is necessary in order to avoid an undue administrative burden on the Commissioner and protect the interests of the Government. If, as petitioners urge, the Court were to hold section 1.1502-77(c)(2), Income Tax Regs., to be invalid insofar as it applies to a corporation which joined in the filing of a consolidated return but which is subsequently determined to be required to file a separate return, we would be insisting upon an administratively burdensome, impractical, and unfair rule that is not manifestly required by section 1502. Such a rule would require the IRS to obtain one or more separate agreements extending the period of limitations from each and every corporation that joins in the filing of a consolidated return. We believe that the imposition of such an administrative burden on the IRS would be contrary to the legislative history of section 141(b) of the 1928 Act, the predecessor of section 1502, which directed the Commissioner to promulgate regulations to address "difficult and complicated problems" relating to the administration of the consolidated return provisions. See S. Rept. 960, supra, 1939-1 C.B. (Part 2) at 419. We conclude that a determination that a corporation which joined in the filing of a consolidated return was improperly included in

---

[37] (...continued)
Tax Regs., under the Code of 1986.

such a return does not alter the agency relationship established under section 1.1502-77(c), Income Tax Regs.  See <u>Intervest Enterprises, Inc. v. Commissioner</u>, 59 T.C. 91, 96-97 (1972).

We reject petitioners' argument that section 1.1502-77(c)(2), Income Tax Regs., is invalid.  We do not find that regulation to be arbitrary, capricious, or manifestly contrary to the broad grant of authority to the Secretary under section 1502.  Consequently, we find that, pursuant to that regulation, the Forms 872 executed by Amax and Cyprus Amax, respectively, extended the respective periods of limitations for 1984, 1985, and 1986 for the assessment of tax due from petitioners' group.[38]  Accordingly, we find that those respective periods of limitations have not expired.

Our finding that the Forms 872 in question extended the respective periods of limitations for 1984, 1985, and 1986 for

---

[38]  Petitioners also claim that "each Form [872] was invalid on its face, because the Service did not attach a rider, as required by Rev. Proc. 72-38, 1972-2 C.B. 813, 814, as modified by Rev. Proc. 82-6, 1982-1 C.B. 409, listing the name, address, and taxpayer identification number of each member of Petitioner's Group."  We disagree.  The revenue procedures on which petitioners rely are applicable to a situation where a parent corporation and its subsidiary corporations file separate returns, and not to a situation such as that presented here where a parent corporation and its subsidiary corporations join in the filing of a consolidated return.  In any event, even if those revenue procedures were applicable in the present case, they are directory, and not mandatory.  Accordingly, any failure by the IRS to follow the procedures set forth therein by attaching a "rider" to the Forms 872 in question would not affect the validity of those forms.  See <u>Cleveland Trust Co. v. United States</u>, 421 F.2d 475, 481-482 (6th Cir. 1970); <u>Luhring v. Glotzbach</u>, 304 F.2d 560, 563 (4th Cir. 1962).

the assessment of tax due from petitioners' group need not, however, be based upon section 1.1502-77(c)(2), Income Tax Regs., and respondent so argues. Specifically, respondent contends that, without regard to section 1.1502-77(c)(2), Income Tax Regs., Amax and its successor Cyprus Amax had the authority under Delaware law to act as the agent of petitioners' group when each executed the Forms 872 in question extending the period of limitations for "Amax and Consolidated Subsidiaries" for each of the years 1984, 1985, and 1986. Furthermore, according to respondent, not only did petitioners' group expressly consent to the authority of Amax and its successor Cyprus Amax to act as its agent in extending the periods of limitations in question, Amax and Cyprus Amax also had apparent authority to execute the Forms 872 in question. Petitioners counter that Amax and Cyprus Amax had neither express nor apparent authority to act as the agent of petitioners' group in extending the periods of limitations in question.

Actual agency or actual authority is defined as the authority which a principal expressly or implicitly grants to an agent. Billops v. Magness Constr. Co., 391 A.2d 196, 197 (Del. 1978).[39]

---

[39] Although the pledge and indemnity agreement, the tax-sharing agreement, and other pertinent agreements entered into by, inter alia, Amax and Alumax provide that they are to be construed in accordance with and governed by the law of New York, where Amax was incorporated, respondent contends, and petitioners do not dispute, that the law of Delaware, where Alumax was incorporated, is the controlling law with respect to both the question of actual agency and apparent agency. In any event, the law on
(continued...)

Apparent agency or apparent authority "arises when the principal creates by its words or conduct the reasonable impression in a third party that the agent has authority to act." Guyer v. Haveg Corp., 205 A.2d 176, 180 (Del. Super. Ct. 1964), affd. 211 A.2d 910 (Del. 1965).  If apparent agency or apparent authority is established, and it is shown that a third party relying on the apparent authority did so rely in good faith and was justified in so relying, the principal is bound to the same extent as with actual authority.  Finnegan Constr. Co. v. Robino-Ladd Co., 354 A.2d 142, 144 (Del. Super. Ct. 1976).

Based on our examination of the entire record in this case, we find that Amax and its successor Cyprus Amax each had both actual and apparent authority to act on behalf of petitioners' group in all matters relating to the examination by the IRS of the consolidated return that was filed by Amax for each of the years 1984, 1985, and 1986, including the execution of the Forms 872 in question on behalf of the corporations in petitioners' group.  That record amply establishes the indicia of such authority, including those described below.

The Forms 872 in question identified the taxpayers as "Amax, Inc. and Consolidated Subsidiaries" or "Amax, Inc. and Consoli-

---

39  (...continued)
those matters is the same in Delaware and New York.  Compare Billops v. Magness Constr. Co., 391 A.2d 196, 197-198 (Del. 1978), with Doxsee Sea Clam Co. v. Brown, 13 F.3d 550, 553 (2d Cir. 1994), and Carte Blanche (Singapore) PTE., Ltd., v. Diners Club Intl., Inc., 758 F. Supp. 908, 919 (S.D.N.Y. 1991).

dated Subs".  We do not construe those forms to include only those subsidiaries of Amax that were in fact members of the affiliated group within the meaning of section 1504(a) that had Amax as its common parent.  Based on our examination of the entire record in this case, we find that the reference to "consolidated subsidiaries" in the Forms 872 in question is to each of the subsidiaries of Amax that joined in the consolidated return that Amax filed for 1984, 1985, and 1986, regardless whether each of those corporations was in fact a member of that affiliated group.  Petitioners, which have the burden of proof, have not established to the contrary.

Petitioners were specifically identified and listed in the Form 851 (Affiliations Schedule) that listed the corporations that were included in the 1984 consolidated return.[40]

Alumax, on behalf of petitioners' group, executed a documented dated August 12, 1985, that was entitled "ELECTION TO BE A MEMBER AS OF JANUARY 1, 1984" and that was signed by John A. Brader as vice president of Alumax.  That election document provided:

> Based on an Agreement dated January 30, 1984[41] by and
> among Alumax Inc., AMAX Inc., Mitsui and Co., Ltd. and
> Mitsui and Co. (U.S.A.) Inc. as amended that gives AMAX
> Inc. 80% of the voting power of all classes of Alumax
> stock entitled to vote, Alumax and each of its subsid-
> iaries hereby elects under United States Treasury

---

[40]  The record does not contain the Forms 851 for 1985 and 1986.

[41]  The record contains no document that purports to be an agreement dated Jan. 30, 1984.

Regulations Section 1.1502-76(b)(5)(i) to become a
member of the group of which AMAX Inc. is the common
parent as of January 1, 1984.

Amax, on behalf of petitioners, filed tax information (e.g., income, deductions) relating to each of the petitioners for each of the years 1984, 1985, and 1986 when it filed the consolidated return for each of those years.

Pursuant to an agreement between Amax and Mitsui USA, Amax included as part of the 1984 consolidated return that it filed a "Disclosure Statement under Section 6661 of the Internal Revenue Code".[42]  That disclosure statement provided:

An Agreement dated January 30, 1984[[43]] by and among
Alumax Inc., AMAX Inc., Mitsui & Co. Ltd. and Mitsui &
Co. (U.S.A.), Inc. as amended (a copy of which is
attached hereto) gives AMAX Inc. 80% of the voting
power of all classes of Alumax stock entitled to vote.
* * * Based on the Agreement Alumax and each of its
subsidiaries has elected under United States Treasury
Regulations Section 1.1502-76(b)(5)(i) to become a
member of the group of which AMAX Inc. is the common
parent as of January 1, 1984.  Accordingly, Alumax and
each of its subsidiaries is included as of January 1,
1984 in the AMAX Inc. Consolidated Income Tax Return
filed for the year ended December 31, 1984.

Pursuant to the pledge and indemnity agreement, Amax and its

---

[42]  We believe that the stockholders of Alumax required Amax to file the disclosure statement because of the potential tax liability of petitioners' group relating to the consolidation issue presented to this Court.  Since the members of the Amax group had net operating losses for each of the years 1984, 1985, and 1986 and the members of petitioners' group had taxable income for each of those years, any tax that might result if petitioners ultimately were not allowed to join in the consolidated return filed by Amax for each of those years would be a tax against petitioners' group, and not the Amax group.

[43]  See supra note 41.

successor Cyprus Amax, and not Alumax or any other petitioner, was to have control over any challenges by the IRS to the inclusion of petitioners in the consolidated return filed by Amax for each of the years 1984, 1985, and 1986.  That agreement stated:

> (a)(i)  If the Internal Revenue Service shall propose an adjustment in the tax liability of the Alumax Consolidated Group [petitioners' group] for which Amax would be required to pay an indemnity pursuant to Section 1 of this Agreement (a "Challenge to Consolidation"), then Alumax or Amax, whichever shall receive notice of the Challenge to Consolidation from the Internal Revenue Service, shall give prompt notice to the other of the Challenge to Consolidation.  _Amax shall determine in its sole discretion whether to contest the Challenge to Consolidation, and, with respect to any such contest, shall determine the nature of all action to be taken to contest such Challenge to Consolidation_ including (A) whether any action to contest such Challenge to Consolidation shall be by way of judicial or administrative proceedings, or both, (B) whether any such Challenge to Consolidation shall be contested by resisting payment of the proposed adjustment or by paying the same and seeking a refund thereof, and (C) if Amax chooses to proceed through judicial proceedings, the court or other judicial body before which judicial action shall be commenced.  Amax shall have full control over any contest pursuant to this Section 3(a), but shall keep Alumax and the Mitsui Group informed of the status thereof and shall consider in good faith requests by them concerning the contest of the claim.

> (ii)  Notwithstanding paragraph (i) above, Alumax shall retain the rights specified in Section 6 of the Tax Sharing Agreement with respect to issues described therein other than whether the inclusion of the Alumax Consolidated Group in the Combined Consolidated Group [the Amax group and petitioners' group] was proper.
> * * *  [Emphasis added.]

Based on our examination of the entire record before us, we find that, regardless whether for each of the years 1984, 1985, and 1986 petitioners were members of the affiliated group within

the meaning of section 1504(a) or amended section 1504(a) that had Amax as its common parent, Amax and its successor Cyprus Amax each had both actual authority and apparent authority to act on behalf of Alumax and the other members of petitioners' group when each executed one or more of the Forms 872 in question. Accordingly, we further find that the respective periods of limitations for the years 1984, 1985, and 1986 for the assessment of tax due from petitioners' group have not expired.

To reflect the foregoing,[44]

<u>Decision will be entered for respondent</u>.

---

[44] The correlative issues involving certain claimed general business credit carrybacks also are resolved against petitioners' group in light of our holdings on the principal issues presented. See <u>supra</u> note 3.